THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL LeCOUR, Defendant-Appellant.

Second District No. 2—87—0724

Opinion filed July 29, 1988.

Sheldon L. Banks, of Chicago, for appellant.

James E. Ryan, State's Attorney, of Wheaton, and Mark T. Schuster, of Strom & Schuster, of Elgin (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Daniel LeCour, was charged with one count of unlawful possession with intent to deliver less than 10 grams of a substance containing cocaine. Defendant's motion to quash arrest and suppress evidence, based on lack of probable cause for his arrest, was denied. After a jury trial, defendant was found guilty as charged and was subsequently sentenced to a three-year term of imprisonment in the Department of Corrections. On appeal, he argues that there was no probable cause for his arrest, that his intent to deliver was not proved beyond a reasonable doubt, and that a mistrial should have been declared when a police officer testified to defendant's post-arrest silence. For the reasons set forth below, we affirm.

Defendant and his girlfriend were arrested on November 12,

1986, following a controlled drug transaction. Charges against her were nol-prossed in juvenile court, and defendant filed a motion to quash his arrest and suppress evidence seized from him after his arrest. At the suppression hearing, Detective Kirk Schwabe, of the Downers Grove police department, and Agent Charles Dvorak of Du Page Metropolitan Enforcement Group (DUMEG), testified to the events leading to defendant's arrest.

Agent Dvorak testified that on November 12, 1986, at about 4:30 p.m., he was at the Downers Grove police department where he interviewed Kevin Vondersmith, who had been arrested earlier that day on a charge of delivery of a controlled substance, cocaine. Vondersmith told Dvorak that defendant was the source of his cocaine and that he had purchased cocaine from defendant about 50 times. Vondersmith explained the normal routine he went through to purchase cocaine from defendant. He would contact defendant on a telephone pager and enter an identification code number, the number of the pay phone from which he was calling, and a digit indicating the amount of cocaine he wanted to buy. Dvorak asked Vondersmith to try to arrange a purchase that evening, and Vondersmith suggested calling from a doughnut shop as he had called defendant from that phone in the past.

Dvorak and another agent, Agent Sullivan, took Vondersmith to the doughnut shop, where Vondersmith dialed the pager number and identification number. Approximately 15 to 20 minutes later the phone rang; Vondersmith answered it and had a conversation. Vondersmith hung up and told Dvorak that defendant had agreed to deliver cocaine to him at the Just Games arcade not far from the doughnut shop.

Surveillance agents were informed of the new location, and Dvorak, Sullivan and Vondersmith went to the arcade. When defendant had not arrived within half an hour, Dvorak took Vondersmith to a pay phone at the gas station next to the arcade where Vondersmith made another call to the pager. As they returned to the arcade, Dvorak saw a red or orange Pontiac pull into the gas station. He recognized defendant in the front passenger seat and the female driver, defendant's girlfriend. Dvorak and Vondersmith continued into the arcade. The driver came into the arcade, approached Vondersmith and had a short conversation with him. Vondersmith left the arcade and went to the car while defendant's girlfriend played the video game Vondersmith had been playing. Vondersmith went to the passenger side of the Pontiac and appeared to have a short conversation with defendant. Vondersmith then walked away from the car, and defend-

ant got out and began to pump gas. Defendant's girlfriend then left the arcade, and as she and Vondersmith passed each other in the parking lot, they both extended their left hands and made contact. Dvorak believed an item had been passed, but he could not tell what it was. At that time, defendant started to run around the back of the car, slipped to one knee, and got up and went to the passenger side of the car. Believing that a transaction had occurred, the surveillance team moved in and arrested defendant, his girlfriend, and Vondersmith.

Vondersmith was searched at the police station, and it was found that he still had the money the agents had given him to make the buy. He did not have any controlled substances. Defendant was also searched, and the agents discovered 3.3 grams of cocaine, the amount Vondersmith had arranged to purchase, in the crotch of defendant's underwear. A telephone pager was also recovered from defendant.

Officer Schwabe also described the events leading to defendant's arrest. He had observed Vondersmith sell cocaine the night before and had arrested Vondersmith. Schwabe interviewed Vondersmith, told him he believed defendant was his source, and asked him to set up a buy. Vondersmith agreed, and Schwabe contacted Agent Dvorak. Dvorak came to interview Vondersmith, and Dvorak told Schwabe a buy would be made from defendant. Schwabe saw Dvorak, Sullivan and Vondersmith go to the doughnut shop and then to Just Games. Schwabe set up surveillance about 50 yards from Just Games. Schwabe's description of the events at the arcade was similar to Dvorak's. He saw Vondersmith walk to the passenger side of the car, speak briefly to the passenger, and walk away towards the gas station. Schwabe then saw defendant's girlfriend walk past Vondersmith towards the car. Their hands extended and an item was passed. Defendant, who was pumping gas, made a quick motion towards the passenger side of the car. Schwabe believed a drug transaction had occurred at that time and radioed the other units to move in and make the arrests.

Dvorak and Schwabe gave similar testimony at trial. In addition, Vondersmith testified to his role in the transaction. He described for the jury his purchase from defendant on the night of his own arrest and how he again contacted defendant at the request of Dvorak and Schwabe. A chemist testified that she had tested the substance recovered from defendant and that it contained cocaine. Defendant's girlfriend testified that she, defendant and Vondersmith met to go to a party.

Defendant first argues that the trial court erred in denying his

motion for a mistrial where, on cross-examination, Dvorak testified to defendant's post-arrest silence after receipt of *Miranda* warnings. At trial, Dvorak testified that he recovered the telephone pager from defendant after the arrest. Dvorak also described how a pager functions and gave examples of persons who carry pagers for business or occupational needs. During cross-examination by defense counsel, the following colloquy occurred:

"MR. BANKS: Now, you told us that Mr. Lecour [*sic*] is not a police officer, is not a serviceman. Did Mr. Lecour [*sic*] tell you that his family is in the business of giving estimates on woodwork and that is why he had the pager?

MR. BURKE: Judge, I will object to the facts not in evidence and also irrelevant.

MR. BANKS: Your Honor, they went into it on redirect.

THE COURT: I will sustain the objection unless there is some basis for the question other than—

MR. BANKS: Well, Your Honor,—

THE COURT: Oh, he may answer.

MR. BANKS: Thank you.

THE WITNESS: I didn't have any conversation at all. He refused to give us anything from his name to his birth date or any information.

THE COURT: Just a second. For purposes of the pager question, I am going to take the position that for certain aspects of how a pager is used, a jury has general information on how a pager is used, and by whom a pager is used and the availability of telephone pagers.

MR. BANKS: Your Honor, I would like the remark made by the officer to be stricken as not responsive.

THE COURT: Yes. That remark by the officer is not to be considered by the jury.

MR. BANKS: And also a motion—

THE COURT: And the jury is to disregard that answer made by the witness.

MR. BANKS: Thank you, Your Honor.

THE COURT: The jury will be instructed to disregard any remarks made by the officer not within the question or the statement."

■ Defendant asserts that Dvorak's response was an improper comment on defendant's post-arrest silence, so that the trial court's denial of defendant's motion for a mistrial was reversible error. As a general rule, the use of an accused's silence at the time of his arrest

and after he has received *Miranda* warnings violates the self-incrimination clause of the fifth amendment and the due process clause of the fourteenth amendment to the United States Constitution. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *People v. Rehbein* (1978), 74 Ill. 2d 435.) Due to the insoluble ambiguity surrounding every post-arrest silence, the *Doyle* court determined that it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. (*Doyle*, 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2244.) In *Doyle*, the defendants testified at trial that they had been framed in a drug transaction, and, on cross-examination, the prosecutor questioned them about their failure to give that explanation when they were arrested. It was the impeachment use of the defendants' post-arrest silence which was held to be error.

■ While it is true that Agent Dvorak testified that defendant was silent after his arrest, we do not believe that the testimony violated the *Doyle* rule because defendant's post-arrest silence was not offered to impeach exculpatory testimony offered at trial. Instead, Dvorak's comment was invited by defense counsel's question, which was objected to by the State. The clear implication of defense counsel's question was that defendant had made an exculpatory statement to Dvorak at the time of arrest. This situation would seem to fall within the exception expressly recognized by the *Doyle* court:

> "It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." (*Doyle*, 426 U.S. at 619 n.11, 49 L. Ed. 2d at 98 n.11, 96 S. Ct. at 2245 n.11.)

In the instant case, the defendant did not testify, so while defendant himself did not testify that he had made an exculpatory statement to Dvorak, the question posed by defense counsel certainly gave such an impression to the jury. As characterized by defendant's reply brief, defense counsel was trying to "offer the jury an alternate explanation for defendant's beeper." Defendant now complains that he was prevented from doing so by Dvorak's answer. In essence, defense counsel attempted to impeach Dvorak with defendant's own purported exculpatory statements without defendant being subject to cross-examination himself, while at the same time denying the prosecution the op-

portunity to explain the one-word answer defendant attempted to elicit. Such a result was clearly not intended by the *Doyle* court. We conclude no error occurred because Dvorak's testimony was not used to impeach exculpatory testimony of defendant but was simply a denial to defense counsel's question of whether defendant behaved in a certain way after arrest. The cases cited by defendant do not require a different conclusion because in those cases the references to silence were used to impeach the defendants. See *People v. Jacobs* (1977), 51 Ill. App. 3d 455; *People v. Deberry* (1977), 46 Ill. App. 3d 719; *People v. McDowell* (1972), 4 Ill. App. 3d 382.

■ Even if Dvorak's testimony was improper, any error was harmless beyond a reasonable doubt. Dvorak's comment was but an isolated reference during a two-day trial. (See *People v. Miller* (1983), 96 Ill. 2d 385, 396, *later grant of habeas corpus reversed sub nom. Greer v. Miller* (1987), 483 U.S. 756, 97 L. Ed. 2d 618, 107 S. Ct. 3102.) Defendant's objection to the remark was promptly sustained, and the jury was instructed to disregard the answer. Such an instruction is normally sufficient to cure a trial error. (*Miller*, 96 Ill. 2d at 395.) Moreover, the prosecution made no comment about the testimony, so it may be concluded that the jury was not influenced by the testimony. (*People v. Douglas* (1978), 58 Ill. App. 3d 149, 152.) Under these circumstances, there does not appear to be a reasonable probability that the complained-of testimony contributed to defendant's conviction, so the error, if any, was harmless. (*People v. Titone* (1986), 115 Ill. 2d 413, 425.) The trial court thus did not err in denying defendant's motion for a mistrial.

Although defendant concedes that he was proved guilty of possession of a controlled substance, he next argues that it was not proved beyond a reasonable doubt that he intended to deliver it. Defendant contends that, because he possessed a relatively small amount of cocaine and because no other indicia of drug trafficking were recovered, an inference of intent to deliver cannot be upheld. He therefore requests that his conviction be reversed and remanded for resentencing on a conviction of simple possession.

■ Whether an individual possesses the intent to deliver a controlled substance is not always subject to direct proof. (*People v. Marshall* (1987), 165 Ill. App. 3d 968, 976.) Mental states by their very nature must generally be inferred from the facts and circumstances surrounding an alleged offense. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 525.) The existence of a particular mental state is a question of fact to be determined by the jury, as with any other fact. (*Hunter*, 124 Ill. App. 3d at 525.) On such a question of fact, a reviewing court

will not lightly overturn a jury's finding and will not substitute its judgment for that of the trier of fact unless the evidence is so improbable as to raise a reasonable doubt of guilt. *People v. Edwards* (1984), 128 Ill. App. 3d 993, 997, citing *People v. Molstad* (1984), 101 Ill. 2d 128.

■ In arguing that the circumstances here do not give rise to an inference that he intended to deliver the cocaine in his possession, defendant contrasts his situation with several other cases where possession of large amounts of controlled substances, drug paraphernalia, weapons, or large amounts of currency was held to support the inference of intent to deliver. (See *People v. Kline* (1976), 41 Ill. App. 3d 261 (possession of more than 500 grams of marijuana, drug paraphernalia, and other drugs); *People v. Munoz* (1982), 103 Ill. App. 3d 1080 (250 grams of cocaine); *People v. Atencia* (1983), 113 Ill. App. 3d 247, *cert. denied* (1983), 464 U.S. 917, 78 L. Ed. 2d 261, 104 S. Ct. 283 (1,953 grams of cocaine, loaded gun and $26,900 in cash).) These cases do not hold, however, that such factors are exclusive indicia of intent to deliver. Intent to deliver may be inferred from various circumstances. (*People v. Knight* (1985), 133 Ill. App. 3d 248, 254.) While defendant focuses on the "small amount" of cocaine he possessed (see *Kline*, 41 Ill. App. 3d at 264 (4.55 grams of cocaine termed "small amount")), he ignores the testimony of Kevin Vondersmith. Vondersmith testified that defendant had delivered approximately a gram of cocaine to him the day before defendant's arrest. That transaction was set up when Vondersmith contacted defendant by way of defendant's telephone pager. The next day, Vondersmith again contacted defendant in the same manner, and, according to Vondersmith's testimony, defendant agreed to bring 3.3 grams of cocaine to him at the Just Games arcade. Defendant did bring that amount with him when he met Vondersmith. Although the transaction was not consummated, the inference that defendant intended to deliver the cocaine is clearly supported by Vondersmith's testimony regarding his contacts with defendant on November 11 and 12, 1986. As such, it does not appear to us that the inference the jury drew is inherently impossible or unreasonable. (*People v. Schaefer* (1985), 133 Ill. App. 3d 697, 703.) Defendant was therefore proved guilty of possession of a controlled substance with intent to deliver beyond a reasonable doubt.

■ Defendant's final argument is that the trial court erred in denying the motion to quash arrest and suppress the evidence seized because there was no probable cause for the arrest. A reviewing court will not disturb a trial court's finding on a motion to suppress unless that finding is manifestly erroneous. (*People v. Tisler* (1984), 103 Ill.

2d 226, 248.) The task on review is simply to ensure that the trial court had a substantial basis for concluding that probable cause existed. (*Tisler*, 103 Ill. 2d at 248, citing *Illinois v. Gates* (1983), 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332.) Although this issue is close, as illustrated by the trial court's comment that the evidence presented at the suppression hearing was "not the strongest case in the world," we do not believe the trial court's finding that the officers had probable cause to arrest defendant and his girlfriend is manifestly erroneous.

■ Probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a person of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Lippert* (1982), 89 Ill. 2d 171, 178.) While "mere suspicion" that the person arrested has committed the offense is an insufficient basis for arrest, evidence sufficient to convict is not required. (*Lippert*, 89 Ill. 2d at 178.) Focusing on the meeting at the gas station and arcade, defendant argues that no reasonable person would believe that an offense had occurred or that defendant had committed one.

■ It does seem that Agent Dvorak and Officer Schwabe's testimony as to the events at the gas station and arcade would not alone lead a reasonable person to believe that a crime was being committed. The officers merely observed a car with two occupants pull into a gas station. The driver entered an adjoining arcade and spoke with another person who was playing an arcade game while the passenger began to put gas in the car. The person in the arcade went out to the car and appeared to have a conversation with the passenger, who had returned to his seat. The driver played the arcade game for a short time and walked back toward the car. As the driver approached the person from the arcade, they both extended their left hands and made contact, possibly exchanging something. At that time, the passenger, who had resumed pumping gas, started to quickly return to the car seat, slipping to one knee in the process. At this point, the decision to make the arrest was made.

As defendant notes, even furtive gestures or movements by themselves do not normally create a reasonable suspicion that a person is involved in a crime. (*People v. Mills* (1983), 115 Ill. App. 3d 809, 814.) In this case, however, the arresting officers were aware of much more than the activities just described. Vondersmith told them that defendant had delivered cocaine to him the night before and that the transaction was arranged by means of defendant's pager. When cooperat-

ing with the police the next day, Vondersmith said that he would again contact defendant on the pager, giving defendant the phone number from which he was calling. The police observed Vondersmith dial a series of numbers into the pay telephone at the doughnut shop, and the pay phone rang soon thereafter. Vondersmith answered it, and after having a conversation with the caller, told the officers that defendant would deliver cocaine to him at the Just Games arcade.

Although defendant points out that the police did not have prior experience with Vondersmith's reliability, his information was corroborated in almost every respect. He said that defendant could be contacted by pager, which proved to be accurate. He said that defendant would call the number dialed into the pager, and defendant soon called. He said that the transaction would take place at the Just Games arcade, and defendant came to the arcade within an hour. The corroboration of these predictions would indicate that Vondersmith's other assertion that defendant was delivering cocaine was also true. (*Gates*, 462 U.S. at 244, 76 L. Ed. 2d at 552, 103 S. Ct. at 2335, quoting *Spinelli v. United States* (1969), 393 U.S. 410, 427, 21 L. Ed. 2d 637, 650, 89 S. Ct. 584, 594 (White, J., concurring); see also *Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329 (where arresting officer verified every facet of information given by informant except whether suspect was carrying drugs, officer had reasonable grounds to believe the remaining unverified bit of information).) Thus, even though defendant's activities at the gas station were apparently "innocent," the corroboration of the information given by Vondersmith was sufficient to give the arresting officers reasonable grounds to believe that defendant was committing an offense. While Vondersmith did not signal that a sale had been made, probable cause to arrest defendant arose when he arrived at the arcade as planned and the apparent exchange took place. The trial court's determination that probable cause existed for defendant's arrest is thus not manifestly erroneous.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

INGLIS and REINHARD, JJ., concur.