THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LARRY BROWN, Defendant-Appellant.

First District (6th Division)   No. 1—91—0914

Opinion filed May 29, 1992.—Modified on denial of
rehearing August 28, 1992.

Donald Hubert & Associates, of Chicago (Donald Hubert and Andre La-Berge, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Brian Clauss, and George Arnold, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

Following a jury trial, defendant, Larry Brown, was convicted of possession of a controlled substance with intent to deliver and armed violence and was sentenced as an habitual offender to natural life im-

prisonment. Defendant has appealed his convictions, asserting that he was deprived of his right to a fair trial and that he was not proved guilty of these offenses beyond a reasonable doubt.

On appeal, defendant claims (1) the trial court improperly allowed testimony by Officer Patrick McCarthy as to the habits of drug sellers; (2) the trial court erred in refusing to answer a query from the jury regarding defendant's alleged possession of a weapon; (3) the trial court erred in allowing rebuttal testimony introduced by the State; (4) he was deprived of his right to a fair trial by improper comments made by the prosecutor during closing argument; (5) the trial court erred in requesting that defendant identify a single juror for questioning in the presence of the entire jury; and (6) he was not proved guilty beyond a reasonable doubt.

The record indicates that defendant was charged by indictment with one count of possession of a controlled substance with intent to deliver (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(b)(2)), one count of armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2), and one count of unlawful use of a firearm by a felon (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1(A)). At trial, the State proceeded only on the charges of possession of a controlled substance with intent to deliver and armed violence. Following a jury trial, defendant was convicted of both offenses. Thereafter, the trial court determined that defendant was an habitual offender based upon his prior convictions for murder and armed violence, and the court sentenced defendant to natural life imprisonment. Ill. Rev. Stat. 1989, ch. 38, par. 33B—1.

At trial, Chicago police officer Steven Nowells testified that on January 12, 1990, he was assigned to a tactical unit and was on duty with his partner, Officer Elgin Holt. At approximately 6 p.m., Nowells and Holt were in their squad car near 75th Street and South Shore Drive in Chicago when they observed a new Nissan Infiniti with no license plates or temporary sticker. The officers stopped the car and saw the defendant get out of the driver's seat as they exited their squad car. According to Nowells, defendant was wearing a long fur coat which swung open as he turned toward the officers, revealing a gun tucked into defendant's waistband. Nowells testified that they immediately grabbed defendant, and Holt recovered defendant's gun, which Nowells described as a blue-steel, nine-millimeter Smith and Wesson. The officers then placed defendant under arrest and conducted a search. Nowells stated that they recovered from defendant's coat pocket a plastic bag containing cocaine, a plastic bag containing marijuana cigarettes, and $1,409 in cash. Nowells indicated that defendant told them that he was unemployed.

Nowells testified that he completed the necessary inventory slips for the recovered gun, controlled substances, and cash. On cross-examination, Nowells admitted that the inventory sheet which he signed indicated that he had recovered the gun from defendant. Nowells also acknowledged that he drove the Nissan to the police station following defendant's arrest, but he denied that he searched the car and found the gun in the trunk. Nowells stated that he did not send the controlled substances out to be fingerprinted because they had been recovered from defendant's person and were not taken from the scene of a violent crime. Nowells indicated that he thought he and Holt were working the evening shift on January 12, 1990, which would have been from 6 p.m. to 2:30 a.m.

Nowells stated further that he did not recall including in the police report a statement that the temporary license permit for the Nissan was not displayed, and he denied removing the permit from the rear window of the Nissan at the police station. Nowells testified that defendant was sober when they arrested him, and the officers did not request assistance. In addition, defendant had not violated any other traffic laws, had not made any furtive movements or gestures in the car, and had not attempted to speed away.

Officer Elgin Holt's description of the arrest and search of defendant was substantially the same as that presented by Nowells. In addition, Holt testified that the gun recovered from defendant was loaded and that defendant made some movement toward his coat as the officers approached him. Holt stated that the cocaine recovered from defendant was chunky and rocky. Holt also stated that defendant had a valid driver's license when he was arrested. Holt testified that he and Nowells worked from 11 a.m. to 7 p.m. on January 12, 1990.

Holt testified further that on March 12, 1990, he received an inventory tracer slip for the gun recovered from defendant. Holt explained that a tracer slip comes from the inventory department after a case has been disposed. Holt stated that upon receipt of the tracer slip, he learned that the case against defendant had been dismissed, and he then marked the slip to indicate that the gun should be destroyed.

Chicago police officer Patrick McCarthy was called as an expert witness for the prosecution to testify as to the street value of the cocaine recovered from the defendant. McCarthy testified that he was an experienced police officer who had been assigned to the Chicago department of the FBI. McCarthy stated that prior to his assignment to the FBI, he had worked for five years as an undercover officer in

the police department's gang crime unit and had made several hundred narcotics purchases from street gang members. While working in this capacity, McCarthy dealt with both dealers and buyers of narcotics.

The prosecutor then asked McCarthy how cocaine could be ingested. When defense counsel and the trial judge questioned the relevancy of this examination, one of the prosecuting attorneys responded that this testimony was foundation evidence of the street value of the cocaine, and the other prosecutor stated that this testimony was necessary as a foundation for McCarthy's "expertise to testify to the underlying question."

Thereafter, the trial court permitted McCarthy to testify as follows:

"Cocaine can be either snorted, smoked, it can be cooked up and put in a syringe and it can be injected into the body. It can also be smoked. What they do is they roll up a marijuana cigarette and before they seal it up they sprinkle powdered cocaine onto the marijuana cigarette then roll it up and smoke it.

\* \* \*

A user would normally buy small quantities of cocaine. They would buy packages consisting of quarter grams, half grams or single gram packages.

\* \* \*

[Packages of cocaine sold to users are] usually packaged in a tin foil packet or a paper packet, and they're usually used real soon after they're purchased."

The prosecutor also asked McCarthy what type of paraphernalia was commonly used to ingest or to bring the cocaine into the body, and defense counsel objected. The trial judge then called a side bar, during which he asked the prosecutors to explain why this evidence was necessary in order to have McCarthy testify that he was familiar with the price of cocaine. One of the prosecuting attorneys stated that the evidence was introduced to establish that a dealer would not necessarily possess the paraphernalia of a user, and the absence of such paraphernalia would be circumstantial evidence of defendant's intent to deliver.

When the trial judge commented that this was "really farfetched," the other prosecutor argued that intent to deliver controlled substances was frequently shown through the testimony of an officer who was qualified as a street-value expert and who testified as to the amount of controlled substances and the size of the packages. Thereafter, the trial court overruled defense counsel's objection and allowed

McCarthy to testify that hypodermic needles were commonly employed by users of cocaine, along with straws and pipes, and that there were different types of ways to cook cocaine in order to smoke it.

McCarthy subsequently testified that the street value of the cocaine found on defendant's person was approximately $900, and the street value of one marijuana cigarette was $1, if not laced with another drug.

McCarthy stated further that the packages carried by narcotics dealers were substantially larger than those carried by users, who only buy small packets. McCarthy also stated that "if you get anything over a couple of grams you're normally talking about somebody that's dealing." Defense counsel objected to this testimony, and the trial court immediately instructed the jury to disregard the statement about "somebody that's dealing."

Thereafter, McCarthy explained that "[s]tepping is a common term used in the drug world where people take a good quality cocaine and they've added some other type of powder to it *** to increase the weight of the package which would increase the value of the package." McCarthy stated further that individual users typically purchased cocaine in powdered form and in small packets, and rock cocaine usually has not been "stepped up" or tampered with.

McCarthy testified further that "[t]he narcotics world is a very violent place to be and *** [m]ost cocaine dealers deal in a real volatile environment and most of them carry weapons. The preferred weapons of cocaine dealers are guns. *** [T]he reason they carry them is to protect their profits which are quite substantial." McCarthy explained that drug dealers make a lot of money in a short period of time and that the people they sell to are very violent and hungry to get drugs which causes dealers to worry about being robbed. McCarthy also stated that narcotics dealers typically commingle their goods with their cash, keeping their money and drugs in one place. He testified that "[i]f the drugs are on a person, the money's usually right there with the drugs."

On cross-examination, McCarthy acknowledged that a heavy user could snort a couple of grams of cocaine in a day and that a heavy user would go through more than two grams of cocaine per day by smoking it in a pipe.

The State then called Martinique Rutherford as an expert witness. Rutherford testified that she was employed by the Chicago police department in the crime lab division and was assigned the task of analyzing the bag of white powder which was recovered from defendant.

Rutherford found that this substance consisted of 6.51 grams of a white powder which contained cocaine. Rutherford testified further that this substance also contained dilutants which are "used to bulk up a small amount to make it look big."

Lieutenant Joseph Shields testified that he was commander of inventory for the Chicago police department. Shields explained that for each item of evidence inventoried, a tracer slip must be sent to the officer who recovered the item. That officer then is required to give instructions as to the disposition of the evidence. Shields stated that on March 12, 1990, Holt signed the inventory tracer slip and directed the destruction of the gun recovered from defendant. The gun was destroyed on September 10, 1990. Shields testified that he originally sent the tracer slip for the gun to Nowells, who was identified on the inventory report as the officer who recovered the gun.

Shields stated further that due to the great number of handguns currently inventoried and because of the limited amount of space available to store them, it was necessary to destroy weapons as soon as possible to make room for more. Shields indicated that 12,500 weapons had been destroyed from January 1 through December 10, 1990.

The State then called Linda Rayford as an expert witness to testify as to the analysis and identification of the marijuana cigarettes recovered from defendant. The trial judge called counsel for both parties into his chambers and indicated that he did not think the marijuana had anything to do with the case because defendant had not been charged with possession of marijuana. The trial judge stated that he felt the State was "over-trying the case, *** putting in things that probably may result in reversal." The prosecutors argued, however, that the presence of the marijuana cigarettes was probative to show intent to deliver and that it was necessary to prove up the testimony of Nowells and Holt. Thereafter, the trial judge permitted Rayford to testify that the cigarettes recovered from defendant weighed 2.7 grams and contained marijuana.

At the close of the State's case in chief, defendant moved for a directed verdict of acquittal, asserting that the State had failed to prove the charge of possession of a controlled substance with intent to deliver. The trial judge initially reserved his ruling, but later denied the motion.

Defendant called Eddie Wilson, Sr. (Wilson, Sr.), who testified that he was 70 years old and was retired from Ford Motor Company, where he had been employed for 18½ years. Wilson, Sr. stated that he had known defendant for 20 years and considered him to be his

adopted son. He testified that he lived on the second floor of the two-flat at 5817 S. Union, while his son, Eddie Wilson, Jr., lived with his family on the first floor. Defendant, known by Wilson, Sr. as both Larry Brown and Michael Smith, lived in the basement apartment in that building.

Wilson, Sr. testified that he purchased a new Nissan Infiniti from Loeber Motors on January 11, 1990, the day before defendant was arrested. He stated that he saw the salesperson put the temporary license sticker on the rear window and that the sticker was still on the window the following day, January 12, 1990, when he allowed his son and defendant to borrow the car.

On cross-examination, Wilson, Sr. testified that defendant did not pay any rent and had been living in his building for the past three or four years, since defendant was released from jail. Wilson, Sr. stated further that he received retirement pay in the amount of $1,200 per month and that his son did not pay rent for the first-floor apartment. On redirect examination, Wilson, Sr. testified that his house was paid for and that his wife earned $225 per week.

Wilson, Sr. testified that he paid "38 something" for the car, and he admitted that he did not know the exact model of the car. He stated that he paid mostly cash for the car's $12,000 down payment and that he took the cash for the down payment from a safety deposit box. Wilson, Sr. stated further that defendant's girlfriend, Stephanie Matthews, deposited the down payment with Loeber Motors. On January 9, 1990, Matthews brought $7,500 to the dealership, and on January 11, 1990, she made an additional payment of $4,500. Matthews was listed as Wilson, Sr.'s "daughter" and "nearest relative not living with you" on his application for financing.

Wilson, Sr. also testified on cross-examination that he had the only keys to the Infiniti and that neither defendant nor Stephanie Matthews had a set of keys to the car. Yet, on redirect examination, Wilson, Sr. stated that his wife had a second set of keys and was allowed to loan out the car. Wilson, Sr. stated that January 12, 1990, was the only time defendant had used his car. Wilson, Sr. was not aware that defendant had been ticketed while driving the Infiniti on March 16, 1990, and on April 23, 1990. Wilson, Sr. also stated that defendant had not used the car on May 26, 1990. He stated, however, that he was aware that Stephanie Matthews had been ticketed while driving the car sometime during the spring of 1990. Wilson, Sr. testified that he kept the car's registration card in the glove compartment and never gave it to defendant.

Defendant also called Eddie Wilson, Jr. (Wilson, Jr.), who testified that he was 39 years old and had known defendant for over 20 years. Wilson, Jr. stated that he was a self-employed mechanic, and because he had been robbed once, he carried a gun while working to protect himself and his children.

Wilson, Jr. testified that on January 12, 1990, he was working in the garage next door to his house, and he had a gun in his overalls. Wilson, Jr. threw his overalls into the trunk of the Infiniti when he left to pick up a friend downtown at 4 p.m. Wilson, Jr. stated that he returned home after he picked up his friend and drove her to her destination.

Wilson, Jr. stated further that after he returned home, he remembered that he had to pick up another car for repairs. Wilson, Jr. asked defendant to go with him so defendant could drive the Infiniti back home. Wilson, Jr. testified that he had forgotten about the nine-millimeter pistol in the trunk, and he did not tell defendant about it. Wilson, Jr. stated that the temporary license sticker was still in the rear window of the Infiniti when he and defendant left to pick up the car needing repairs.

Wilson, Jr. also testified that defendant had a substance abuse problem with cocaine. He stated that defendant snorted cocaine every day and that defendant did not work but supported himself by gambling. Wilson, Jr. testified that he has seen defendant win $4,000 or $5,000.

On cross-examination, Wilson, Jr. stated that his gun was not registered. Wilson, Jr. also admitted that he did not tell the judge, prosecutor, or any police officer that the gun recovered from defendant was his. He stated further that he went to court in January 1990 to tell the judge that the gun recovered from defendant was his, but the case was dismissed.

The record reflects that the parties stipulated during the State's case in chief that Officer Holt originally received a March 6, 1990, court appearance date but, four days after defendant's arrest, the case was advanced on defendant's motion from March 6 to February 7, 1990. Holt did not appear on February 7, and the trial court denied a motion for a continuance by the State. The State moved for a *nolle prosequi*, and the court dismissed the case. On May 1, 1990, a grand jury returned an indictment against defendant for the instant charges.

The defense then called defendant's girlfriend, Stephanie Matthews, who testified that she was 23 years old and had known defendant for 18 months. Matthews stated that when defendant called her at

approximately 6:30 p.m. on January 12, 1990, she went to the police station with Wilson, Sr.'s wife. At the station, she spoke with Officer Nowells, who gave her the keys to the Infiniti, and she and Mrs. Wilson left. Mrs. Wilson drove the Infiniti home, and Matthews followed her back to 58th Street and then noticed that the temporary license sticker was missing from the car's rear window. Matthews returned to the station, but Nowells had left. She asked another officer for the sticker, and he went into Nowells' office and returned with the temporary license which he gave to her.

Matthews testified further that when she was with him, defendant used cocaine two or three times a day and snorted it until his nose bled. She stated that she had taken defendant to Michael Reese Hospital for treatment for his nose bleeds. Matthews also stated that defendant was not employed, but made all of his money by gambling. She testified that she had seen him win $4,000 or $5,000 in one night, including once during January 1990.

On cross-examination, Matthews testified that she worked as a secretary and that she also used the name "Stephanie Powe." Matthews stated further that although she had obtained a receipt in her name for part of the down payment for the Infiniti, she had received the money for the down payment from Wilson, Sr. Matthews also testified that she was soon to be Wilson, Sr.'s daughter-in-law.

Matthews admitted that she had been ticketed while driving the Infiniti on May 20, 1990. During his cross-examination of Matthews, one of the prosecutors referred to her "arrest" on that date. Defense counsel moved for a mistrial, but the trial court denied the motion.

Matthews testified that she did not recall having receipts for the down payment on the Infiniti in her purse on May 26, 1990, and that she did not recall possessing repair receipts from Loeber Motors and a windshield sticker for the car on that date. Matthews stated that defendant did not pay for a compact disc player for the Infiniti, although his signature appeared on the receipt.

Matthews testified further that in addition to his use of cocaine several times a day, defendant also smoked marijuana two to three times daily. She stated, however, that she had never seen defendant with a gun.

On redirect examination, Matthews explained that she had been arrested on May 20, 1990, for speeding and for assaulting a police officer, but the charges had been dismissed.

On rebuttal, the State called Andy Tangen, who testified that he was the business manager of Loeber Motors. Tangen stated further that the business records of Loeber Motors reflected that Eddie Wil-

son, Sr., purchased a 1990 Nissan Infiniti Q-45 sedan on January 11, 1990, but Tangen stated that he had no personal knowledge of the sale. The records of the dealership also reflected that the total sale price of the vehicle was $39,341, and that Wilson, Sr. made a down payment of $12,000, which was paid partly in cash and partly by a money order.

Tangen testified further that a repair order from the service department of the dealership reflected that a compact disc changer was installed in the Infiniti on February 26, 1990, at a cost of $1,220.26, which was paid in cash and that defendant's signature appeared on the receipt.

Defense counsel moved to strike the testimony of Tangen on the ground that it was improper rebuttal, but the trial court denied the motion.

On cross-examination, Tangen stated that a temporary license permit was prepared for the Infiniti and that the dealership's procedure dictated that a salesperson place the permit in the car window. On redirect examination, Tangen testified that he did not know if the permit was actually placed in the window of the car purchased by Wilson, Sr., and that in some instances, customers do not want the permit placed in the window.

The State then called State Trooper Steven Christensen, who testified that he stopped Matthews on April 1, 1990, for speeding while driving the Nissan Infiniti. He stated that he gave Matthews an arrest citation for driving with a suspended license and a warning for speeding. Christensen stated further that the defendant was a passenger in the car with Matthews on that date and that defendant drove the car from the scene because Matthews' license had been suspended. Christensen also testified that he stopped defendant in the Infiniti on April 23, 1990.

Defense counsel objected to the testimony of Christensen on the ground that it was improper rebuttal, but the trial court overruled the objection.

On cross-examination, Christensen stated that he found no narcotics or guns on defendant when he was stopped on April 23, 1990.

The State called Officer William Sander, who testified that he was employed by the police department for the Village of Richton Park. On March 16, 1990, Sander issued a speeding ticket to defendant, who was driving the Nissan Infiniti.

On cross-examination, Sander stated that he found no narcotics or guns on defendant when he was stopped on March 16, 1990.

Finally, the State called Chicago police officer Dennis Cullom, who testified that he, along with other officers, recovered several documents from Stephanie Matthews on May 26, 1990. Cullom stated that these documents included a credit statement for Wilson, Sr., a receipt from Loeber Motors bearing the name of defendant for the installation of a compact disc changer, sales receipts made out to Matthews and to Wilson, and the vehicle's price sticker. Cullom stated further that he recovered from defendant's wallet the registration card for the Nissan Infiniti.

Prior to Tangen's testimony, defense counsel moved for a mistrial on several grounds. Specifically, counsel argued that defendant had been escorted and guarded by Will County sheriffs during the entire trial, permitting the jury to infer that defendant was dangerous and involved in criminal conduct in another county. Defense counsel also asserted that, according to defendant, one of the jurors had observed defendant in ankle and wrist shackles after the first day of trial. Although the juror was questioned alone by the court and denied having seen defendant in shackles, defendant identified the juror in the presence of the entire jury.

In her motion for a mistrial, defense counsel contended further that the State's introduction of evidence that defendant possessed marijuana was prejudicial because defendant had not been charged with this offense. Finally, defense counsel argued that McCarthy, the prosecution's expert witness as to street value, gave testimony which was prejudicial, irrelevant, nonspecific as to actual instances, and tailored to the facts of the instant case. The trial court denied defense counsel's motion for a mistrial on all grounds.

During closing argument, the prosecutor referred to defendant as a "no good rotten unemployed person." The trial court sustained an objection by defense counsel, called a side-bar, and instructed the jury to disregard the prosecutor's remark.

In reference to the destruction of the gun recovered from defendant, the prosecutor argued to the jury that "[f]ingerprints don't mean anything in this case because if there were fingerprints she (defense counsel) would have an explanation for it." The trial court overruled an objection by defense counsel, and the prosecutor argued further that "[t]he explanation would be *** the police officer made me touch the gun. The police officers rolled my fingers on the gun to make sure they were going to *** have fingerprints on the gun."

At this point, the trial court interrupted the prosecutor's argument and immediately admonished the jury that "[c]ounsel should refrain from engaging in personal attacks on other counsel. I've in-

structed you on the purpose of closing arguments. Again, I will remind you your decision on this case must be based on the evidence and on the law."

The prosecutor subsequently argued that through his drug use, defendant has "end[ed] up with fast women."

The prosecutor also argued to the jury as follows:

"If you find that defendant possessed this with intent to deliver he's guilty of armed violence. If you find that he possessed this for his own possession, he's guilty of armed violence because he had a gun on him."

After defense counsel objected, the prosecutor continued and stated "[a]s simple as that. That's what the law is." Thereafter, the trial court instructed the jury that the attorneys' arguments were not to be taken as statements of the law and that instructions would be given later.

While deliberating, the jury sent the judge two questions. The first was phrased "[d]id the two arresting officers who were partners *start* and *finish* their duty at the same time on Jan. 12?" After consultation with counsel for both the State and for defendant, the trial judge responded by telling the jury that they had heard the evidence and must search their memories.

The jury's second question read "[d]oes the term 'on or about his person' include the interior compartment of the car, or the trunk? If not, what does it mean?" After this question was received, the trial judge conferred with the prosecuting attorneys and with counsel for defendant. Counsel for both the prosecution and defense stated that the jury should be instructed that they have the law. The trial court then responded that "[t]he jury heard the evidence. The jury must rely on its memory of the evidence. The jury has the instructions of law applicable to the case. Continue to deliberate."

The jury subsequently found defendant guilty of possession of a controlled substance with intent to deliver and of armed violence.

The State filed a petition to have defendant adjudged an habitual criminal pursuant to section 33B—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 33B—1). The State introduced evidence that on April 18, 1985, defendant had pled guilty to the charges of possession of a controlled substance with intent to deliver and armed violence. The State also introduced evidence that on July 11, 1976, defendant had been convicted of murder. Accordingly, the trial court determined that defendant was an habitual criminal and sentenced him to life imprisonment.

We initially consider defendant's contention that the trial judge committed reversible error when he allowed Officer McCarthy, a narcotics expert called by the State to establish street value, to testify regarding the common practices of drug dealers and users.

Specifically, defendant argues that he was prejudiced by McCarthy's testimony that drug dealers frequently carry guns to protect their large profits, commingle their cash and drugs, and carry packages of cocaine in larger amounts than would users. Defendant also complains that he was prejudiced by McCarthy's testimony that individual drug users typically buy powdered, "stepped-up" cocaine in small amounts of quarter-gram, half-gram, or single-gram packages, and require certain paraphernalia to snort, smoke, or inject the cocaine into their bodies.

It is established that expert testimony which is probative and relevant should be allowed (*People v. Bradley* (1988), 172 Ill. App. 3d 545, 551, 526 N.E.2d 916; *People v. Henne* (1988), 165 Ill. App. 3d 315, 325, 518 N.E.2d 1276), and evidence is relevant where the fact or circumstances offered tend to prove or disprove a disputed fact or to render the matter in issue more or less probable (*Bradley*, 172 Ill. App. 3d at 551; *People v. Jones* (1982), 108 Ill. App. 3d 880, 884, 439 N.E.2d 1011). The probative weight of evidence must be balanced against any possible prejudice which might result from its introduction, and evidence should be allowed only where its probative value outweighs the danger of unfair prejudice. *Bradley*, 172 Ill. App. 3d at 551; *People v. DeHoyos* (1976), 64 Ill. 2d 128, 132-33, 355 N.E.2d 19; *People v. Groleau* (1987), 156 Ill. App. 3d 742, 748, 509 N.E.2d 1337.

■■ In the case at bar, McCarthy was presented as an expert witness for the State, and his testimony was offered to establish the street value of the controlled substances recovered from the defendant. Yet, his testimony went far beyond merely attesting to the value of the cocaine and marijuana found on defendant's person. McCarthy also described common practices, habits, or characteristics of drug sellers. This evidence amounted to profile testimony which was not in any way connected to the defendant or the circumstances surrounding his arrest on January 12, 1990, and should have been excluded. See *Bradley*, 172 Ill. App. 3d at 551.

We find that the improper admission of McCarthy's testimony as to the habits of drug sellers caused prejudice to defendant and deprived him of a fair trial. Consequently, we hold that defendant is entitled to a new trial on this basis.

The State has argued that McCarthy's testimony was properly admitted. In support of this contention, the State has cited *People v.*

*King* (1991), 218 Ill. App. 3d 248, 578 N.E.2d 217, which held that the testimony by a narcotics expert concerning drug paraphernalia was admissible because it was an expert's opinion which addressed the ultimate issue of whether the defendant had the intent to deliver the controlled substance. *King*, 218 Ill. App. 3d at 253.

In reaching this conclusion, the court noted that the test for the admissibility of the testimony was whether it would aid the jurors' understanding of the case, and the court determined that the average juror was incapable of making a distinction between a drug dealer and a drug user without the assistance of an expert. (*King*, 218 Ill. App. 3d at 253.) The court further held that the testimony of the narcotics expert was not unduly prejudicial because the jury was not required to accept it. *King*, 218 Ill. App. 3d at 253.

We find, however, that the determination in *King* was premised upon factual circumstances which are radically different from those presented in the instant case.

In *King*, police officers stopped defendant's vehicle and discovered three handguns, a knapsack containing ammunition, and a locked box which contained cocaine, a measuring device, packaging materials, and plastic bags. The opinion in *King* states merely that during trial, a police officer who was qualified as a narcotics expert testified that the drug paraphernalia found in the defendant's possession "would indicate a dealer in cocaine rather than a user." (218 Ill. App. 3d at 251.) The trial judge admitted this testimony over defendant's objection.

In the case before this court, McCarthy offered extensive and detailed testimony as to the habits and practices of narcotics dealers. Specifically, McCarthy testified to the various methods by which cocaine could be ingested and as to the different types of drug paraphernalia required for each of these methods. He stated further that a user would normally buy cocaine in powdered form and in small quantities of cocaine in packages consisting of quarter grams, half grams or a single gram. McCarthy indicated that these small packages of cocaine were typically used very soon after purchase. He testified further that the packages carried by narcotics dealers were substantially larger than those carried by users. According to McCarthy, rock cocaine usually has not been "stepped up" for sale to users. McCarthy also stated that the narcotics world was a very violent place and that most cocaine dealers carried guns in order to protect their substantial profits. Finally, McCarthy explained that narcotics dealers typically kept their money and drugs in one place and that "[i]f the drugs are on a person, the money's usually right there with the drugs."

This testimony went far beyond the simple comment made by the

narcotics officer in *King.* Rather, McCarthy's testimony consisted of a complete profile of a drug dealer which corresponded to the circumstances surrounding defendant's arrest.

Moreover, we note that in *King,* the jury was permitted to consider the narcotics officer's testimony that the defendant's possession of drug paraphernalia "would indicate a dealer *** rather than a user." (218 Ill. App. 3d at 251.) Yet, the State relies upon *King* in support of its argument to the contrary. In the case before this panel, the State has asserted that McCarthy's testimony was properly admissible to establish that the *absence* of drug paraphernalia indicated that defendant was a dealer rather than a user.

We find that *King* is factually distinguishable from the case at bar and is not controlling upon our determination of the issues presented herein. In addition, we decline to adopt the position that the average juror is incapable of making a distinction between a drug dealer and a drug user without the assistance of an expert. We also decline to hold that the admission of McCarthy's testimony was not unduly prejudicial because the jury was not required to accept it.

■ Defendant next challenges the trial court's refusal to directly answer the question from the jury regarding defendant's possession of the gun. Based upon our determination that defendant is entitled to a new trial, we decline to address this issue because it will not likely recur on retrial.

Defendant also claims that the trial court erred in allowing rebuttal testimony introduced by the State. Specifically, defendant contends that the court should have excluded the testimony by Christensen, Sander, and Cullom that they executed traffic stops of both defendant and of Matthews. Defendant argues that this testimony did not rebut any of the testimony presented by defendant's witnesses, and therefore, its introduction constituted reversible error.

The decision to permit rebuttal testimony rests largely in the discretion of the trial court, and that decision will not be reversed on appeal unless the court has abused its discretion resulting in prejudice to the defendant. (*People v. Sandoval* (1990), 135 Ill. 2d 159, 194, 552 N.E.2d 726; *People v. Andrews* (1988), 172 Ill. App. 3d 394, 399, 526 N.E.2d 628.) Proper rebuttal evidence answers or contradicts affirmative matters raised by the defense in its case in chief. *People v. Torres* (1990), 198 Ill. App. 3d 1066, 1073, 556 N.E.2d 741.

■ The record reveals that Wilson, Sr. testified that the Nissan Infiniti belonged to him; that January 12, 1990, was the only time that he permitted defendant to use the car; and that defendant had not used the car at any other time.

This evidence was directly contradicted by the testimony of Trooper Christensen, who stated that defendant was driving the Infiniti on April 23, 1990, and by Officer Sander, who stated that defendant was driving the car on March 16, 1990. Wilson, Sr.'s statement that he owned the Infiniti was contradicted by the testimony of Officer Cullom, who stated that on May 26, 1990, he recovered the vehicle identification card for the Nissan Infiniti from defendant's wallet and that he recovered a receipt, bearing defendant's name, for the installation of a compact disc player in the Infiniti.

Because the evidence presented on rebuttal contradicted the testimony of Wilson, Sr., as to the ownership and use of the Infiniti, the trial court properly allowed its introduction. *Torres*, 198 Ill. App. 3d at 1073; *Andrews*, 172 Ill. App. 3d at 399.

Defendant next contends that certain improper comments made by the prosecutor during closing argument resulted in substantial prejudice and deprived him of his right to a fair trial.

Specifically, defendant asserts that the prosecutor's reference to him as a "no good rotten unemployed person" served to prejudice the jury against him. Defendant also complains that the prosecutor attacked the credibility of defense counsel and engaged in improper argument when he commented on the lack of fingerprint evidence on the gun recovered from defendant. The record reveals that immediately after each of these remarks, the trial court sustained objections by defense counsel and admonished the jury to disregard the prosecutor's comment. This action by the trial judge served to cure any possible prejudice to the defendant. See *People v. Harris* (1989), 129 Ill. 2d 123, 160-61, 544 N.E.2d 357; *People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746; *People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200.

In addition, defendant claims that the prejudice toward him was increased by the prosecutor's comment that defendant had "end[ed] up with fast women" which defendant asserts implied that Stephanie Matthews used drugs, gambled, and was sexually or morally loose. Yet, defendant's failure to object to this comment during trial and his failure to include it in his post-trial motion constituted waiver of the issue on appeal. (*People v. Turner* (1989), 128 Ill. 2d 540, 555, 539 N.E.2d 1196, 1202; *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1131-32, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Defendant also asserts that the prosecutor misstated the applicable law as to the charge of armed violence. Because defendant failed to raise this issue in his post-trial motion, he has waived it on appeal. *Turner*, 128 Ill. 2d at 555; *Enoch*, 122 Ill. 2d at 186.

Although these comments by the prosecutor will not, of themselves, be considered reversible error (*People v. Morgan* (1991), 142 Ill. 2d 410, 452-53, 568 N.E.2d 755; *People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746), we would hope that the prosecutor would refrain from excessive argument on retrial.

■ Defendant next asserts that the trial court committed reversible error by requesting that defendant identify a single juror for questioning in the presence of the entire jury. This issue is not likely to recur on retrial, and accordingly, we need not address it here.

Finally, defendant claims that the State presented insufficient evidence to prove him guilty beyond a reasonable doubt of possession of a controlled substance with intent to deliver and of armed violence. Based upon our determination that the cause must be remanded for a new trial, we are bound to consider the sufficiency of the evidence presented by the State. See *People v. Whitlow* (1982), 89 Ill. 2d 322, 342-43, 433 N.E.2d 629; *People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366.

Defendant initially asserts that there was insufficient evidence to prove that he intended to deliver the 6.51 grams of rock cocaine recovered from his pocket. A reasonable inference of intent to deliver is permitted when the amount of the controlled substance possessed could not be viewed as designed for personal consumption. (*People v. Rouser* (1990), 199 Ill. App. 3d 1062, 1065, 557 N.E.2d 928; *People v. Friend* (1988), 177 Ill. App. 3d 1002, 1021, 533 N.E.2d 409; *People v. Marshall* (1988), 165 Ill. App. 3d 968, 976, 521 N.E.2d 538; *People v. Hunter* (1984), 124 Ill. App. 3d 516, 526, 464 N.E.2d 659; *People v. Atencia* (1983), 113 Ill. App. 3d 247, 250, 446 N.E.2d 1243.) Evidence that the defendant possessed a weapon, a combination of drugs, and large amounts of cash also provide support for the inference that the defendant intended to sell the controlled substances rather than to keep them for his own use. *Rouser*, 199 Ill. App. 3d at 1065; *Friend*, 177 Ill. App. 3d at 1021; *People v. Schaefer* (1985), 133 Ill. App. 3d 697, 702-03, 479 N.E.2d 428.

Defendant asserts, however, that the evidence is insufficient to prove intent to deliver because the officers recovered only 6.51 grams of cocaine from him and because there was evidence that this amount of cocaine could have been consumed by one person over a period of two to four days. We find this argument unpersuasive.

■ There was no evidence that defendant had ever used rock cocaine or had consumed the drug by smoking it. Rather, the testimony of Wilson, Jr. and Matthews indicated that defendant's use of the drug consisted of snorting powdered cocaine two to three times per day. When defendant was arrested, he had no paraphernalia which would in-

dicate that he intended to smoke the rock cocaine. Defendant did, however, have 6.51 grams of the substance which was valued at $900, in addition to $1,409 in cash, 18 marijuana cigarettes, and a gun, according to the arresting officers. Thus, the jury could reasonably have concluded that defendant intended to sell the substance rather than to consume it himself. The mere fact that defendant possessed only 6.51 grams does not require a finding that he intended it for personal use. See *People v. Berry* (1990), 198 Ill. App. 3d 24, 555 N.E.2d 434 (defendant convicted of possession with intent to deliver where he had 3.9 grams of cocaine and $31,000 in cash, but no drug-use paraphernalia); *People v. LeCour* (1988), 172 Ill. App. 3d 878, 527 N.E.2d 125 (defendant convicted of possession with intent to deliver where he had 3.3 grams of cocaine and a telephone pager).

Minor inconsistencies in testimony do not constitute grounds for reversal of a criminal conviction (*People v. Scott* (1987), 152 Ill. App. 3d 868, 872, 505 N.E.2d 42, 45; *People v. Daniels* (1984), 129 Ill. App. 3d 894, 900, 473 N.E.2d 517, 522; *People v. Wright* (1972), 3 Ill. App. 3d 829, 833, 279 N.E.2d 398, 401), and the effect of testimonial discrepancies upon the credibility of the witnesses is a matter for the jury to determine (*People v. Furby* (1990), 138 Ill. 2d 434, 455, 563 N.E.2d 421). In the instant case, the jury was aware of the discrepancies in the testimony of the arresting officers but apparently determined that these discrepancies were minor and did not compel the conclusion that the testimony of the officers was not credible.

It is within the province of the trier of fact to determine the credibility and weight of the testimony, to resolve the inconsistencies and conflicts therein, and to render its decision accordingly. (*Furby*, 138 Ill. 2d at 455.) Where the evidence is conflicting, it is the prerogative of the trier of fact to ascertain the truth. (*Furby*, 138 Ill. 2d at 456.) When a defendant offers an explanation of his conduct, the plausibility of that story is to be determined by the trier of fact, and the jury is entitled to disbelieve the explanation offered. *People v. Kline* (1976), 41 Ill. App. 3d 261, 267, 354 N.E.2d 46.

The jury heard all of the evidence presented by the State and by the defendant and concluded that defendant was guilty of possession of a controlled substance with intent to deliver. Considering the evidence in the light most favorable to the prosecution (*Furby*, 138 Ill. 2d at 455), a rational trier of fact could have found defendant guilty of possession of a controlled substance with intent to deliver.

■ Defendant also claims that the State presented insufficient evidence to prove him guilty of armed violence beyond a reasonable doubt. Defendant asserts that his armed violence conviction was based on im-

probable and unsatisfactory evidence where the State failed to perform a fingerprint analysis on the gun which was destroyed in September 1990, four months after defendant was indicted on the instant charges. It is notable, however, that in making this argument, defendant does not cite a single case which lends support to his contention that the evidence against him was insufficient.

The testimony of Nowells and Holt indicated that the gun was recovered from the waistband of defendant's pants after he got out of the Nissan Infiniti. The jury heard this evidence along with that of Wilson, Jr., who stated that the gun belonged to him and that it was inside his coveralls in the trunk of the car. The record established that the jury considered this question very carefully, as evidenced by the question sent to the trial judge.

As noted above, it is within the province of the trier of fact to determine the credibility and weight of the testimony, to resolve the inconsistencies and conflicts therein, and to render its decision accordingly. (*Furby*, 138 Ill. 2d at 455.) Where the evidence is conflicting, it is the prerogative of the trier of fact to ascertain the truth. (*Furby*, 138 Ill. 2d at 456.) When a defendant offers an explanation of his conduct, the plausibility of that story is to be determined by the trier of fact, and the jury is entitled to disbelieve the explanation offered. *Kline*, 41 Ill. App. 3d at 267.

The jury heard all of the evidence presented by the State and by the defendant and concluded that defendant was guilty of armed violence. Considering the evidence in the light most favorable to the prosecution (*Furby*, 138 Ill. 2d at 455), a rational trier of fact could have found defendant guilty of armed violence.

We conclude that this evidence was sufficient to support convictions for possession of a controlled substance with intent to deliver and for armed violence beyond a reasonable doubt. Accordingly, we hold that the cause must be remanded for a new trial on the charges raised in the indictment.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

McNAMARA and RAKOWSKI,* JJ., concur.

---

*Justice Rosemary LaPorta authored the first opinion in this case. After her death, Justice Rakowski participated in the petition for rehearing. He has read the briefs and has listened to the oral argument tape.