THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID
REATHERFORD, Defendant-Appellant.

Fourth District    No. 4—03—0101

Opinion filed December 29, 2003.

328

Gregory B. Grigsby (argued), of Grigsby & Swiney, of Taylorville, for appellant.

Scott Rueter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and Kathy Shepard (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE TURNER delivered the opinion of the court:

In January 2001, the State charged defendant, David Reatherford, with one count of unlawful possession of a methamphetamine-manufacturing chemical with the intent to manufacture methamphetamine with a prior unlawful-possession-of-a-controlled-substance-with-intent-to-deliver conviction. In March 2001, defendant filed a motion to suppress evidence and to quash the stop and arrest, which the trial court denied. In October 2002, a jury found defendant guilty. Following the denial of defendant's posttrial motion, the court sentenced him to eight years in prison.

On appeal, defendant argues (1) the trial court erred in denying his motion to quash the stop and arrest and suppress evidence, (2) the State failed to prove him guilty beyond a reasonable doubt, (3) the trial court erred in allowing certain testimony as to the acts and practices of others involved in methamphetamine manufacturing, and (4) the trial court erred in giving the jury an accountability instruction. We affirm.

## I. BACKGROUND

In January 2001, the State charged defendant, along with Douglas K. Dean, by information with one count of unlawful possession of a methamphetamine-manufacturing chemical with the intent to manufacture methamphetamine with a prior unlawful-possession-of-a-controlled-substance-with-intent-to-deliver conviction (720 ILCS 570/401(c—5) (West 2000)), alleging he knowingly and unlawfully possessed a methamphetamine-manufacturing chemical, ephedrine, with the intent to manufacture 15 grams or more but less than 30 grams of a substance containing methamphetamine.

In March 2001, defendant filed a motion to suppress evidence and to quash the stop and arrest. In May 2001, the trial court held a hearing on the motion. Illinois State Police Sergeant Paul Moody testified he made a traffic stop of a blue 1993 Chevrolet pickup at the request of task force officers on January 22, 2001, south of Decatur. Sergeant Moody exited his vehicle and asked the driver, defendant, to see his driver's license, and defendant complied. Sergeant Moody told defendant that another officer had witnessed defendant change lanes without signaling. He gave defendant a verbal warning and handed his license to Master Sergeant Todd Kilby.

Defendant testified he was leaving Decatur on the afternoon of January 22, 2001. He stated he never left the right-hand lane of the interstate nor did he change lanes. He produced his driver's license upon request from a state trooper. Defendant stated the officer never gave his driver's license back or gave him a verbal warning. Thereafter, Trooper Moody "pulled [him] out of the truck" and searched him and the truck without his permission. On cross-examination, defendant testified he was on his way to Pana, where he lived, when the police stopped him. Defendant was accompanied by Douglas Dean as they left Decatur after shopping at Wal-Mart.

The State called Master Sergeant Todd Kilby of the Illinois State Police, who testified he was a supervisor to Task Force X in Decatur. He stated the Task Force received a call from Michael Cottrell, a security officer at a Wal-Mart in Decatur, on January 22, 2001, stating two individuals that were known to him as Douglas Dean and David Reatherford were in the store purchasing Sudafed and Coleman fuel, ingredients used in the manufacture of methamphetamine. Cottrell relayed a description of the individuals' truck, license plate number, and the direction the truck was heading. Sergeant Kilby testified he observed a blue truck with license plates matching the numbers given by Cottrell heading west on Interstate 72. He then observed the vehicle change lanes without signaling and "weav[e] across the centerline back and forth out of his lane." Sergeant Kilby then requested a uniform officer in a marked squad car make a traffic stop. After the vehicle was stopped, Sergeant Kilby approached the passenger side and observed two one-gallon cans of Coleman fuel behind the front seat and two lithium batteries sitting on the passenger seat. He then asked the passenger, Douglas Dean, to step out of the truck so he could talk to him. Upon identifying himself as a police officer and initiating questioning, Sergeant Kilby found Dean to be "nervous," "shaking," "he was stuttering and just showing that he was nervous talking to [him]." Dean told him the individuals were coming from Pana and were going to Pana. Sergeant Kilby questioned how that

could be, and Dean stated he had been at a Menard's store in Forsyth. Upon questioning defendant, Sergeant Kilby stated defendant told him he was coming from Springfield. Based on his observations and information, including the tip from Cottrell, the items in the truck, and the occupants' deceptive answers, Sergeant Kilby instructed a police officer to place defendant in custody. Upon searching the vehicle, officers found 1,104 30-milligram pills of pseudoephedrine. The trial court found probable cause for the stop and denied defendant's motion.

In October 2002, defendant's jury trial commenced. Mike Cottrell testified he is a loss-prevention officer at a Wal-Mart in Decatur. On January 22, 2001, Cottrell noticed Doug Dean and David Reatherford enter the store. He recognized them from Pana, Illinois, which is where he is from. Cottrell observed Dean in the camping aisle selecting two one-gallon cans of Coleman camping fuel. Cottrell observed defendant in the pharmacy aisle selecting "two or three boxes of cold pills." Cottrell indicated the Decatur Wal-Mart limits customers to buying three boxes of cold medicine or allergy medication, and the Pana Wal-Mart requires customers to ask for it "behind the pharmacy." Cottrell then contacted Task Force X. Defendant and Dean proceeded to different checkout lanes and left the store. Cottrell then observed the two individuals get into a blue pickup truck and head north.

William Kroncke of the Illinois State Police took up surveillance of the blue pickup truck shortly after his office received Cottrell's phone call. After the truck was stopped, Officer Kroncke searched the passenger side and found 46 boxes of pseudoephedrine pills with each box containing 24 30-milligram pills. Other officers recovered eight lithium batteries, cash register receipts, two one-gallon cans of Coleman fuel, a bottle of isopropyl alcohol, two empty boxes of pseudoephedrine tablets, and $245 in cash.

The trial court certified Lieutenant Kilby as an expert in the manufacturing of methamphetamine and procurement of precursors for the manufacturing of methamphetamine. Kilby testified to the two predominant methods of producing methamphetamine, including the Nazi-dope and red-phosphorus methods. He stated the main ingredient common to all 160 methods of production is pseudoephedrine or ephedrine, commonly found in over-the-counter cold or allergy medications.

At the traffic stop of defendant's truck, Kilby observed cans of Coleman fuel and several lithium batteries. A search of the vehicle revealed the fuel and batteries, along with isopropyl alcohol, pseudoephedrine pills, two receipts, and $245 in cash. Kilby testified the isopropyl alcohol is commonly used as a solvent to break down the pills.

The lithium batteries are used in conjunction with anhydrous ammonia. The Coleman fuel is used once the lithium and anhydrous ammonia reaction takes place. Based on his training and experience, Kilby was of the opinion the pseudoephedrine or the methamphetamine-producing chemical was possessed with the intent to manufacture methamphetamine. The factors relied on in forming his opinion included the Coleman fuel, isopropyl alcohol, lithium, and quantity of pseudoephedrine, "far and above what your normal consumer or normal person would have in their possession." Also, Kilby noted the two individuals made separate purchases and came from a location far from their home to purchase items that could be purchased at their home location. Further, the amount of cash seized from defendant coincides with the attempt to purchase chemicals and large amounts of these items. Kilby also stated the purchasers of the chemicals to manufacture methamphetamine are not always the ones who make it but instead may be buying the materials for the "actual cook."

Based on his experience, Kilby stated a "[r]ule of thumb is that [1,000 30-]milligram pills of pseudoephedrine will produce one ounce of methamphetamine." Kilby described the yield rate as how much methamphetamine will be produced from a certain amount of pseudoephedrine. He stated some jurisdictions use an 80% to 90% yield rate, but his office arrived at a 60% yield because "it was the most lenient[,] giving the most margin for error and the most leniency towards the suspect." As to this case, Kilby testified 1,104 30-milligram pseudoephedrine tablets were seized, amounting to 33.12 actual grams of pseudoephedrine. At a 90% yield, 33.12 grams would result in 29.808 grams of methamphetamine. At an 80% yield, 33.12 grams would result in 26.496 grams of methamphetamine. At a 60% yield, 33.12 grams would result in 19.872 grams of methamphetamine.

On cross-examination, Kilby testified the search of defendant's truck did not reveal any anhydrous ammonia, rock salt, solvents, sulfuric acid, or other ingredients used in the making of methamphetamine. He also did not find any recipes for the manufacture of methamphetamine and did not know whether defendant had any capacity to make it.

Defendant did not testify and presented no evidence. Following closing arguments, the jury found defendant guilty of unlawful possession of methamphetamine-manufacturing chemical with intent to manufacture 15 grams or more of a substance containing methamphetamine.

In November 2002, defendant filed a motion for a new trial or in the alternative for judgment of acquittal, arguing the trial court erred

in (1) denying his motion to suppress and quash arrest, (2) overruling his objection to the introduction of evidence as a result of an illegal search and seizure of his vehicle, (3) denying his motion *in limine* as to the reliability of Kilby's testimony as to the amount of methamphetamine that could be manufactured from the pseudoephedrine seized in this case, (4) denying a *Frye* hearing as to the reliability of any evidence offered, (5) accepting Kilby as an expert witness, (6) allowing Kilby to testify "as to the acts and practices of other individuals involved in the production of methamphetamine, and that such evidence amounted to inadmissible profile testimony," (7) denying his motion for directed verdict and judgment of acquittal, and (8) tendering to the jury an instruction on accountability. The trial court denied the motion.

In January 2003, the trial court sentenced defendant to eight years' imprisonment. This appeal followed.

## II. ANALYSIS

### A. Motion To Quash Stop and Arrest and Suppress Evidence

Defendant argues the trial court erred in denying his motion to quash arrest and suppress evidence. We disagree.

### 1. *Standard of Review and Burden of Proof*

■ In reviewing a motion to suppress on appeal, mixed questions of law and fact are presented. *People v. Gherna*, 203 Ill. 2d 165, 175, 784 N.E.2d 799, 805 (2003). A trial court's assessment of witness credibility and factual determinations will be reversed only if manifestly erroneous. *People v. Anthony*, 198 Ill. 2d 194, 200-01, 761 N.E.2d 1188, 1191 (2001). However, the ultimate determination of whether the evidence is suppressed is entitled to *de novo* review. See *People v. Crane*, 195 Ill. 2d 42, 51, 743 N.E.2d 555, 562 (2001).

■ On a motion to suppress evidence, the defendant has the burden of proving the search and seizure were unlawful (725 ILCS 5/114—12 (West 2002)). "However, once the defendant makes a *prima facie* showing of an illegal search and seizure, the burden shifts to the State to produce evidence justifying the intrusion." *People v. Ortiz*, 317 Ill. App. 3d 212, 220, 738 N.E.2d 1011, 1018 (2000).

### 2. *The Traffic Stop*

■ The fourth amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, the Illinois Constitution affords citizens with "the right to be secure in their persons, houses, papers[,] and other possessions against unreasonable searches, [and]

seizures." Ill. Const. 1970, art. I, § 6. Our supreme court has interpreted the search and seizure clause of section 6 in a manner consistent with the United States Supreme Court's fourth amendment jurisprudence. *People v. Gonzalez*, 204 Ill. 2d 220, 224, 789 N.E.2d 260, 264 (2003).

■ When a police officer observes a driver commit a traffic violation, the officer is justified in briefly detaining the driver to investigate the violation. *People v. Sorenson*, 196 Ill. 2d 425, 433, 752 N.E.2d 1078, 1084 (2001). A temporary detention of an individual during a vehicle stop constitutes a seizure of his person within the fourth amendment, even if the stop is brief and for a limited purpose. *Whren v. United States*, 517 U.S. 806, 809-10, 135 L. Ed. 2d 89, 95, 116 S. Ct. 1769, 1772 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772.

> "Because a traffic stop is more analogous to a *Terry* investigative stop (see *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)) than to a formal arrest, the reasonableness of a traffic stop is analyzed under *Terry* principles. [Citation.] A *Terry* analysis involves a dual inquiry: '(1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." ' *Gonzalez*, 204 Ill. 2d at 228, [789 N.E.2d at 266,] quoting *Terry*, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879." *People v. Bunch*, 207 Ill. 2d 7, 13-14, 796 N.E.2d 1024, 1029 (2003).

■ In the case *sub judice*, Lieutenant Kilby witnessed two traffic violations when he saw defendant changing lanes without signaling (625 ILCS 5/11—804(a) (West 2002)) and weaving his vehicle across the centerline (625 ILCS 5/11—709(a) (West 2002)). Therefore, Sergeant Moody, at the request of Kilby, had probable cause to initiate a valid traffic stop, and the stop was thus justified at its inception.

### 3. *Defendant's Arrest*

■ Under the second prong of the *Terry* analysis, the length of the detention and the manner in which it was carried out are considered. *Bunch*, 207 Ill. 2d at 14, 796 N.E.2d at 1029. The United States Supreme Court has stated "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 238, 103 S. Ct. 1319, 1325 (1983) (plurality opinion). Upon initiat-

336

ing a minor traffic stop, a police officer may briefly detain the driver to request his driver's license and determine its validity and, under certain circumstances, conduct a speedy warrant check. *Ortiz*, 317 Ill. App. 3d at 220, 738 N.E.2d at 1018. Once a check of a driver's license and any warrant information is completed, "if no further suspicion is aroused, the traffic stop must cease and the individual should no longer be detained." *Ortiz*, 317 Ill. App. 3d at 220, 738 N.E.2d at 1018. The police officer should then issue a warning ticket and allow the driver to continue on his way. See *People v. Koutsakis*, 272 Ill. App. 3d 159, 164, 649 N.E.2d 605, 609 (1995).

■ In this case, Kilby testified he approached the passenger side of defendant's truck while Sergeant Moody approached the driver's side. Kilby, noticing cans of Coleman fuel and lithium batteries in the truck, then asked Dean to step out of the truck. During a lawful traffic stop, a police officer may order the driver out of the vehicle (*Pennsylvania v. Mimms*, 434 U.S. 106, 111, 54 L. Ed. 2d 331, 337, 98 S. Ct. 330, 333 (1977)) as well as the passengers (*Maryland v. Wilson*, 519 U.S. 408, 415, 137 L. Ed. 2d 41, 48, 117 S. Ct. 882, 886 (1997)). See *Sorenson*, 196 Ill. 2d at 433, 752 N.E.2d at 1084 ("following a lawful traffic stop, police may, as a matter of course, order the driver and any passengers out of the vehicle pending completion of the stop"). Therefore, Kilby could lawfully ask the passenger to step out of the truck.

After Dean exited the vehicle, Kilby asked him where he and defendant were driving to and where they were coming from. An officer may also question the passenger during the seizure if the questions are reasonably related to the purpose of the stop or based on a reasonable, articulable suspicion justifying the question. *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270. If the questions are not justified on these two bases, the officer's questioning is permissible only if does not prolong the stop or change "the fundamental nature of the stop." *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270.

> "An officer may expand the scope of his detention beyond that which is reasonably related to the circumstances only when the officer has a reasonable and articulable suspicion that other criminal activity may be afoot or where matters that arise during the course of the stop cause the officer reasonable suspicion." *People v. White*, 331 Ill. App. 3d 22, 34, 770 N.E.2d 261, 271 (2002).

■ In this case, Kilby's questions to Dean were not related to the initial justification for the stop—defendant's traffic violations. Kilby testified he believed defendant and Dean had purchased precursors to manufacture methamphetamine, relying on the information provided by Cottrell, the Wal-Mart loss-prevention officer. We must then decide whether Kilby had a reasonable and articulable suspicion that criminal

activity may have been afoot based on the informant's tip and Kilby's observations.

"Information provided by an informant which the police rely on to establish probable cause 'must be supported by some indicia of reliability.' [Citation.] One indicia exists 'when the facts learned through police investigation independently verify a *substantial part* of the informant's tip. (Emphasis added.) [Citation.]' " *People v. Davis*, 335 Ill. App. 3d 1, 13, 779 N.E.2d 443, 454 (2002). When police act on an informant's tip, "the totality of the circumstances known to the officers must support their reliance on the information provided by the informant." *People v. Munson*, 206 Ill. 2d 104, 122, 794 N.E.2d 155, 166 (2002).

■ In this case, Cottrell telephoned officers that defendant and Dean, both known to him as being involved with methamphetamine, were in Wal-Mart purchasing Sudafed and Coleman fuel. We note Cottrell identified himself and did not give an anonymous tip to the police. Further, as Cottrell was a public citizen, and not a paid informant, his statements offer a greater degree of reliability. See *People v. Brannon*, 308 Ill. App. 3d 501, 507, 720 N.E.2d 348, 353 (1999) (tips from paid informants less reliable than citizen informants because of presumption that the latter informants act out of an interest in aiding law enforcement and not personal or financial gain). Cottrell later called the police again, giving defendant's vehicle description, license plate number, and direction the vehicle was heading. Police officers found the truck matching Cottrell's description along with the license plate number he had relayed to them. As Kilby approached defendant's truck, he noticed cans of Coleman fuel, further verifying a substantial portion of Cottrell's tip. See *People v. James*, 118 Ill. 2d 214, 225, 514 N.E.2d 998, 1003 (1987) ("when part of [the informant's] story has been verified, the corroboration lends credence to the remaining unverified portion"). Further, Kilby saw two lithium batteries in the truck, which he knew contained a source of lithium metal used in the methamphetamine-manufacturing process. Thus, based on the totality of the circumstances, Kilby could reasonably conclude Cottrell's tip was reliable.

With Cottrell's tip verified and Kilby's observation of Coleman fuel and lithium batteries, Kilby had a reasonable, articulable suspicion that criminal activity was taking place. Therefore, questioning Dean about where he and defendant were going and where they came from was reasonable. During Kilby's questioning, Dean appeared "very nervous" and he was "shaking" and "stuttering." See *People v. Moore*, 341 Ill. App. 3d 804, 811, 792 N.E.2d 836, 842 (2003) ("[n]ervous behavior is a pertinent factor in determining reasonable

suspicion"). Dean stated they traveled from Pana and were heading to Pana. His suspicions aroused, Kilby then asked defendant where they were coming from, and defendant stated they were traveling from Springfield. Based on multiple factors, including Cottrell's tip, the items in the truck, Dean's nervousness, and the occupants' inconsistent and deceptive answers, Kilby had reason to believe the occupants of the vehicle were possessing a methamphetamine-manufacturing chemical with the intent to manufacture methamphetamine. We find the stop of defendant's truck and continued detention and questions posed to Dean and defendant were reasonable under the circumstances.

■ We also find Kilby had probable cause to arrest defendant here. "Probable cause to arrest exists when facts exist that would lead a reasonable person standing in the shoes of the police officers to conclude that a crime has been committed and the defendant was the person who committed the crime." *People v. Robinson*, 167 Ill. 2d 397, 405, 657 N.E.2d 1020, 1025 (1995). Probable cause is determined "according to the totality of the circumstances confronting the officers at the time of the arrest." *People v. Sims*, 167 Ill. 2d 483, 500, 658 N.E.2d 413, 421 (1995). In this case, Cottrell's reliable and verified tip, Kilby's expertise in methamphetamine production and observation of Coleman fuel and lithium batteries in defendant's truck, Dean's nervousness, and defendant's contradictory answers provided sufficient probable cause to arrest defendant for possessing a methamphetamine chemical with intent to manufacture methamphetamine. Defendant's truck could then be searched incident to his arrest. See *People v. Bailey*, 159 Ill. 2d 498, 505, 639 N.E.2d 1278, 1281 (1994) (search of vehicle permitted following a lawful arrest). The trial court therefore did not err in denying defendant's motion to quash arrest and suppress evidence.

## B. Reasonable Doubt Challenge

Defendant argues the State failed to prove him guilty beyond a reasonable doubt of possession of a methamphetamine chemical with the intent to manufacture more than 15 grams of a substance containing methamphetamine. We disagree.

■ When reviewing a challenge to the sufficiency of the evidence in a criminal case, the relevant inquiry is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217, 780 N.E.2d 669, 685 (2002). It is the responsibility of the trier of fact to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259, 752

N.E.2d 410, 425 (2001). Further, "a conviction may be sustained upon wholly circumstantial evidence if it leads to a reasonable certainty the defendant committed the crime." *People v. Shevock*, 335 Ill. App. 3d 1031, 1037, 782 N.E.2d 949, 954 (2003). A court of review will not overturn the verdict of the fact finder "unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt." *People v. Maggette*, 195 Ill. 2d 336, 353, 747 N.E.2d 339, 349 (2001).

██ To sustain a conviction for the offense of possession of methamphetamine-manufacturing chemical with the intent to manufacture methamphetamine, the State must prove the defendant knowingly possessed a methamphetamine-manufacturing chemical with the intent to manufacture 15 grams or more of a substance containing methamphetamine. Here, Cottrell testified he recognized defendant and Dean from Pana, Illinois, as they entered the Wal-Mart in Decatur. As the two split up, Cottrell saw Dean select two cans of Coleman camping fuel and defendant select "two or three boxes of cold pills." The two then checked out separately and left.

██ Special Agent Kroncke testified the search of defendant's truck uncovered 8 lithium batteries, cash register receipts, 2 cans of Coleman fuel, isopropyl alcohol, and 46 boxes of pseudoephedrine pills, each containing 24 30-milligram pills. On defendant's person, the search revealed two empty boxes of pseudoephedrine tablets and $245 in cash. Kroncke testified he did not find any methamphetamine, anhydrous ammonia, coffee filters, or recipes on how to manufacture methamphetamine.

Kilby told the jury that pseudoephedrine is most commonly found in over-the-counter cold medications and is the main ingredient in methamphetamine production. He also explained how pseudoephedrine, lithium, anhydrous ammonia, and Coleman fuel are used in the production of the methamphetamine. Kilby noted the two individuals made separate purchases and traveled from Pana to purchase items that could have been purchased there. Further, he pointed out that defendant possessed a large amount of pseudoephedrine in a quantity that was "far and above what your normal consumer or normal person would have in their possession."

Based on this evidence and the conflicting stories of where the occupants were coming from, a reasonable jury could find beyond a reasonable doubt that defendant possessed the pseudoephedrine with the intent to manufacture methamphetamine. The jury was well aware that the police failed to find a lab, methamphetamine, recipes, or any evidence of defendant's knowledge on how to manufacture methamphetamine. However, the jury had the responsibility to determine the credibility of the witnesses and resolve any conflicts in the evidence.

Defendant argues that possession of the precursors alone, as were found in this case, and without other corroborating evidence, cannot establish beyond a reasonable doubt that defendant possessed the items with the intent to manufacture methamphetamine. In support, defendant cites several cases from the Missouri Court of Appeals and the federal Eighth Circuit Court of Appeals. We note this court is not bound by these decisions. See *Mount Vernon Fire Insurance Co. v. Heaven's Little Hands Day Care*, 343 Ill. App. 3d 309, 320, 795 N.E.2d 1034, 1044 (2003) (cases from foreign jurisdictions not binding on appellate court); *Cooper v. Illinois State University*, 331 Ill. App. 3d 1094, 1100, 772 N.E.2d 396, 400 (2002) (this court not bound to follow decisions of federal courts other than the United States Supreme Court). Moreover, we find the multiple number of precursors found here, along with the conflicting stories told by the truck's occupants, could lead a rational jury to find the circumstantial evidence proved defendant intended to manufacture methamphetamine.

Defendant also argues the State failed to show how much methamphetamine defendant intended to manufacture and only offered the "unreliable" yield testimony from Kilby. He testified to the calculations in determining how much methamphetamine can be produced from a specific quantity of pseudoephedrine. Although some jurisdictions use an 80% to 90% yield rate, his office uses a 60% rate. Based on the 1,104 30-milligram pseudoephedrine tablets seized in this case, Kilby calculated that 33.12 grams of pseudoephedrine would result in 19.872 grams of methamphetamine at a 60% yield. The jury thus had evidence that defendant possessed a methamphetamine chemical with the intent to manufacture 15 grams or more of methamphetamine.

Defendant argues the State did not present evidence that defendant knew how to make methamphetamine or possessed a lab to produce it. In *Shevock*, 335 Ill. App. 3d at 1033, 782 N.E.2d at 951, the police discovered 23 boxes of Sudafed, salt, razor blades, pipes, tubes, valves, a glass jar wrapped in duct tape, a funnel, coffee filters, lithium batteries, and other items, including a substance identified as methamphetamine in the defendant's motel room and car. Agent Kroncke testified to the formula used to predict how much methamphetamine could be yielded from a certain quantity of Sudafed. *Shevock*, 335 Ill. App. 3d at 1034, 782 N.E.2d at 951-52. On appeal, defendant argued the precursor items were legal to own, and he did not have anhydrous ammonia or masks or gloves to handle it, thereby rendering the evidence insufficient to prove his intent to manufacture methamphetamine. *Shevock*, 335 Ill. App. 3d at 1037, 782 N.E.2d at 954. This court, finding the defendant's testimony unbelievable,

concluded the large amount of pseudoephedrine, equipment, and most ingredients used in the manufacture of methamphetamine was sufficient to prove defendant guilty beyond a reasonable doubt. *Shevock*, 335 Ill. App. 3d at 1038, 782 N.E.2d at 955.

In *Shevock*, the State was not required to prove the defendant knew how to manufacture methamphetamine or possessed a lab capable of manufacturing a quantity of methamphetamine. The State also presented evidence from Agent Kroncke on the formula used in determining the yield. Thus, we find the State did not need to establish the existence of a lab or put forth any other evidence as to defendant's state of mind. The presence of the precursor chemicals and the expert testimony on the conversion of the pseudoephedrine to methamphetamine were sufficient to prove beyond a reasonable doubt that defendant intended to produce at least 15 grams of methamphetamine.

## C. Officer Kilby's Testimony

Defendant argues the trial court erred in allowing Officer Kilby to testify to acts or practices of other individuals involved with the manufacturing of methamphetamine and his opinion that the pseudoephedrine was possessed with the intent to manufacture methamphetamine. We disagree.

The decision whether to admit expert testimony, including the expert's qualifications and whether the testimony will assist the trier of fact in understanding the evidence, rests within the sound discretion of the trial court. *Kleiss v. Cassida*, 297 Ill. App. 3d 165, 174, 696 N.E.2d 1271, 1277 (1998). The trial court's decision on the admissibility of an expert's opinion will not be reversed on appeal unless "the error was prejudicial or the result of the trial was materially affected." *Turner v. Williams*, 326 Ill. App. 3d 541, 553, 762 N.E.2d 70, 81 (2001).

In *Richardson v. Chapman*, 175 Ill. 2d 98, 107, 676 N.E.2d 621, 625 (1997), our supreme court found that "a witness, whether expert or lay, may provide an opinion on the ultimate issue in a case." Applying this rule in criminal cases, the supreme court in *People v. Terrell*, 185 Ill. 2d 467, 496-97, 708 N.E.2d 309, 324 (1998), reasoned that because the trier of fact is not required to accept the conclusion proffered by the witness, the testimony cannot be said to usurp the province of the jury.

The trial court certified Kilby as an expert in the manufacturing of methamphetamine and procurement of precursors for the manufacturing of methamphetamine. Thereafter, Kilby testified to various factors that, in his opinion and based on his training and experience, led him to believe that defendant possessed the pseudoephedrine with the intent to manufacture methamphetamine. Specifically, Kilby noted the

quantity of pseudoephedrine, Coleman fuel, lithium batteries, isopropyl alcohol, and the individuals' separate purchases far from home led him to believe defendant possessed the items with the intent to manufacture methamphetamine. Thus, Kilby testified to his certified expertise as found by the trial court, and the expert testimony was relevant in this case.

We find similarities between this case and those dealing with an officer's expert testimony as to the distinction between drug dealers and drug users. For example, in *People v. King*, 218 Ill. App. 3d 248, 251, 578 N.E.2d 217, 219 (1991), the police found guns, ammunition, cocaine, and drug paraphernalia, including a measuring device, packaging materials, and plastic Baggies. At trial, a police officer, who was qualified as a narcotics expert, testified the drug paraphernalia indicated a cocaine dealer rather than a user. *King*, 218 Ill. App. 3d at 251, 578 N.E.2d at 219. A jury found defendant guilty of possession of a controlled substance, possession with intent to deliver, and unlawful use of weapons. *King*, 218 Ill. App. 3d at 252, 578 N.E.2d at 219.

On appeal, the defendant argued the trial court erred in allowing the narcotics expert's testimony on the drug paraphernalia because it addressed the ultimate issue of whether the defendant had the intent to deliver cocaine. *King*, 218 Ill. App. 3d at 253, 578 N.E.2d at 220. The appellate court disagreed, finding an expert may express an opinion on an ultimate issue, and the jury could benefit from an expert's testimony in its determination of the drug user-dealer distinction. *King*, 218 Ill. App. 3d at 253, 578 N.E.2d at 220.

Defendant relies on *People v. Brown*, 232 Ill. App. 3d 885, 598 N.E.2d 948 (1992), in claiming he is entitled to a new trial. We find that case distinguishable. There, the defendant appealed his convictions of possession of a controlled substance with intent to deliver and armed violence, arguing, *inter alia*, the trial court improperly allowed an officer's testimony as to the habits of drug sellers. *Brown*, 232 Ill. App. 3d at 887, 598 N.E.2d at 949. On appeal, the defendant claimed he was prejudiced by the officer's testimony that drug dealers frequently carry guns to protect their profits, commingle cash and drugs, and carry packages of cocaine in larger amounts than users. *Brown*, 232 Ill. App. 3d at 898, 598 N.E.2d at 956-57. The appellate court agreed, finding the State offered the officer's testimony to establish the street value of the controlled substances in the case, but the "testimony went far beyond merely attesting to the value of the cocaine and marijuana found on defendant's person." *Brown*, 232 Ill. App. 3d at 898, 598 N.E.2d at 957. Instead, the officer described "common practices, habits, or characteristics of drug sellers," amounting "to profile testimony which was not in any way connected to the

defendant or the circumstances surrounding his arrest." *Brown*, 232 Ill. App. 3d at 898, 598 N.E.2d at 957.

■ In this case, however, Kilby's testimony did not stray beyond those subjects he was qualified to testify on as an expert. Further, Kilby's testimony focused on the facts presented in the case and did not amount to inadmissible profile testimony. See *People v. Moore*, 294 Ill. App. 3d 410, 418, 689 N.E.2d 1181, 1187 (1998) (police expert may give evidence relating to the facts in the case); see also *People v. Robertson*, 312 Ill. App. 3d 467, 469, 727 N.E.2d 404, 406 (2000) (undercover narcotics officer could provide expert testimony on the use of pagers in drug sales); *People v. Foules*, 258 Ill. App. 3d 645, 660, 630 N.E.2d 895, 904 (1993) (police officers experienced in dealing with narcotics may be qualified as experts); *People v. Stone*, 244 Ill. App. 3d 881, 890, 614 N.E.2d 293, 300 (1993) (officer could testify that a drug dealer, rather than a user, typically carried large amounts of drugs, currency, and weapons as long as the testimony related to the issues in the case).

Kilby offered relevant testimony that the jury could find helpful in determining whether defendant had the intent to manufacture methamphetamine. Although the police found no illegal contraband in this case, Kilby could testify to his expertise in the methamphetamine field and offer his insight on the discovered items which, though innocent and legal to possess, led him to conclude the items were possessed with the intent to manufacture methamphetamine. As the jury was not required to accept Kilby's testimony, we find defendant's right to a fair trial was not violated.

## D. Accountability Instruction

■ Defendant argues the trial court erred in giving an accountability instruction to the jury. We disagree. The State proffered a jury instruction on accountability (see Illinois Pattern Jury Instructions, Criminal, No. 5.03 (4th ed. 2000)). Defendant objected, arguing no evidence had been presented tending to prove defendant acted in concert with anyone. The trial court found circumstantial evidence that could lead the jury to conclude defendant and Dean were working together. The court overruled defendant's objection, finding the instruction would aid the jury and the evidence was sufficient to instruct the jury on this issue.

"A person is legally accountable for conduct of another when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense. [Citations.] Even the slightest evidence in support of a theory of accountability warrants

giving the jury an accountability instruction. [Citations.] Some evidence on accountability, along with evidence that defendant acted as a principal offender, is adequate to support instructions on both principal action and accountability, regardless of whether both theories were advanced in the State's case in chief. [Citations.] Accountability instructions may be given even though the defendant is on trial alone." *People v. Testa*, 261 Ill. App. 3d 1025, 1030, 633 N.E.2d 1361, 1366 (1994).

See also *People v. Reeves*, 314 Ill. App. 3d 482, 488, 732 N.E.2d 21, 25-26 (2000).

In this case, the State presented evidence that defendant purchased and possessed pseudoephedrine and other precursors along with Dean. Kilby also testified the individuals who go out and procure the necessary ingredients are not always the ones who manufacture the methamphetamine. Instead, buyers might have a deal with the "actual cook" to buy the materials for money or receipt of the finished product. Thus, the State presented evidence of defendant's direct participation in the charged offense along with circumstantial evidence that he aided another in its commission. Based on the evidence, we find the trial court did not abuse its discretion in instructing the jury on accountability. *Reeves*, 314 Ill. App. 3d at 488, 732 N.E.2d at 25 (trial court's giving of accountability instruction will not be disturbed absent an abuse of discretion).

Moreover, a defendant's claim of improper jury instructions is reviewed under a harmless-error analysis. *People v. Dennis*, 181 Ill. 2d 87, 95, 692 N.E.2d 325, 330 (1998). "[W]hen a jury is improperly instructed regarding the principles of accountability, a new trial is not warranted if the evidence is sufficient to find the defendant guilty beyond a reasonable doubt as a principal." *People v. Amaya*, 321 Ill. App. 3d 923, 929, 748 N.E.2d 1251, 1256 (2001). As discussed earlier, ample evidence existed to support a guilty verdict based on defendant's acting as a principal. Therefore, any error was harmless and a new trial is not required.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, P.J., and APPLETON, J., concur.