# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE CANIZALEZ-CARDENA, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-11-0720 |
| Filed | November 28, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The evidence was sufficient to establish beyond a reasonable doubt defendant's guilt of unlawful possession of methamphetamine with intent to deliver, his motion to suppress on the ground that the traffic stop that resulted in the discovery of the drug in the car in which defendant was a passenger was unconstitutionally prolonged was properly denied, and the trial court, in sentencing defendant, did not err in considering the large amount of drugs involved and the fact that defendant was illegally in the United States. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 10-CF-1664; the Hon. Heidi N. Ladd, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal     Michael J. Pelletier, Karen Munoz, and Nancy L. Vincent, all of State Appellate Defender's Office, of Springfield, for appellant.

Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, Robert J. Biderman, and Luke McNeill, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel     JUSTICE COOK delivered the judgment of the court, with opinion.

Presiding Justice Turner and Justice Pope concurred in the judgment and opinion.

## OPINION

¶ 1     Defendant Jose Canizalez-Cardena (hereinafter Cardena) was charged with unlawful possession with intent to deliver methamphetamine, a Class X felony, in that he knowingly and unlawfully possessed with intent to deliver 900 grams or more of a substance containing methamphetamine. 720 ILCS 646/55(a)(1), (2)(F) (West 2010). Cardena was convicted after a stipulated bench trial and sentenced to 25 years in prison on July 25, 2011. His timely motion to reconsider sentence was denied August 10, 2011, and notice of appeal was timely filed August 12, 2011. The appeal argues three issues: that the evidence was insufficient to convict, that a motion to suppress evidence was improperly denied, and that the trial court considered improper factors in sentencing. We affirm.

¶ 2                  I. BACKGROUND

¶ 3     Illinois State Police trooper Chris Owen testified at a hearing on a motion to suppress. On September 29, 2011, at about 5 p.m., Owen was sitting near mile post 254 on I-57. With him was his drug-detecting dog, Xocko. Owen had been told that a 2002 silver Toyota Camry would possibly be transporting methamphetamine. Owen saw a car fitting that description in the left southbound lane. Owen clocked the car at 71 miles per hour, which was in excess of the 65 mile-per-hour posted speed limit. As the car approached Owen, it made an "abrupt lane change" into the right lane, following a gray passenger car too closely. The Toyota was proceeding slower than the speed limit at that point.

¶ 4     Owen initiated a traffic stop and approached the car on the passenger side. The driver was Leonel Galaviz-Galaviz (hereinafter Galaviz). Defendant Cardena was the only passenger. Galaviz provided a Mexican driver's license. Galaviz's hands trembled and his carotid artery pulsed, and his heart could be seen pounding. Cardena also provided a Mexican license with trembling hands. His carotid artery pulsed and he stared straight ahead. Owen stated it is not

unusual for people to be nervous, but Galaviz was overly so, and Cardena was equally nervous. Owen could smell air fresheners and saw several in the car, which in his experience indicated the possibility of drugs.

¶ 5        Galaviz responded "for the most part" in English to questions. He said he came from Los Angeles. He said he was traveling to "Illinois," and could not say where, but that he was there for construction and demolition work as there was no work in Los Angeles. The insurance for the car was in Galaviz's name, and recently purchased, but the car did not belong to him. As Owen's suspicions were increasing, he went to talk to Cardena in the passenger seat while continuing to fill out the warning tickets. He asked Cardena in Spanish "where" and "work," but got no response. Owen found Cardena to be "exhibiting numerous non-verbal indicators of excessive nervousness and stress," and he asked Cardena in Spanish to get out of the Toyota and stand in the ditch. There was a phone in Cardena's pocket that rang constantly.

¶ 6        At this point, about seven minutes into the stop, Owen opened the rear of the patrol car to release Xocko, a dog trained to detect marijuana, cocaine, methamphetamine, and heroin. As Xocko began to move around the car, Cardena turned his body and appeared to be praying. At the front driver's side door, Xocko indicated by his body language that he detected the odor of narcotics. Xocko then hopped into the car through the open window and alerted to an area in the rear seat cushion. Owen called for backup. He requested and received verbal and written consent, a Spanish form, from Galaviz to search the interior of the car. Owen found a hidden compartment between the rear tires directly below the front of the trunk. He said that Toyota Camrys commonly have this compartment. He drilled a hole and used a fiber-optic scope to see green cellophane bundles. The car was towed to State Police headquarters. There, Owen found the access plate inside the driver's side rear wheel well. The compartment contained 2,236.1 grams of methamphetamine.

¶ 7        The parties stipulated that Owen would testify consistently with his testimony at the hearing on the motion to suppress. He would be qualified as an expert in narcotics trafficking and interdiction, would testify that 2,236.1 grams of methamphetamine is a quantity indicative of an intent to deliver, and that multiple cell phones, two of which were in Cardena's possession, indicated drug sales. He would testify that the street value of the drugs was $628,764.

¶ 8        The parties stipulated to postarrest statements made by Galaviz. Galaviz stated he could not find a job in Los Angeles and a friend, Jose Valle, offered him $4,000 to drive a car from Los Angeles to Chicago, and deliver it to a man unknown to Galaviz. Galaviz believed the car belonged to Valle's brother, Francisco. Galaviz never communicated with the recipient of the car, known to him only as "the Cuban." When Cardena and Galaviz arrived at the instructed location, they waited three hours. Jose Valle then called to tell them the Cuban was there. They followed the Cuban for about an hour and a half. Trooper Owen believed Galaviz's story to be implausible as Galaviz was off route from where he said he was going and could not specify where in Illinois he was coming from. Galaviz and Cardena had known each other for about six months, having met when working construction. Galaviz stated that he and defendant shared the driving duties as they drove across the country. Galaviz did not know Cardena, Jose Valle, or Francisco Valle to be involved in drug trafficking. Galaviz did

not know methamphetamine was in the car.

¶ 9    Further investigation revealed that Cardena was actually Bernabe Galaviz-German and had previously been deported. Registered letters to the owners of the Toyota, sent to addresses in Utah, were returned unclaimed. The parties stipulated that People's exhibit No. 1 was 2,236.1 grams of methamphetamine.

¶ 10    The trial court concluded that it was not credible to believe that the two agreed to drive the car to Chicago in exchange for $4,000 for Galaviz and "for the thrill of a ride" for Cardena. It was not credible that the two would agree to meet an unidentified Cuban in Chicago, switch cars, and drive back.

> "It is apparent they were acting as couriers and clearly knew they were transporting that car and then switching it out for drugs to come back to whatever place was going to be the delivery point. And in that context their reaction to the trooper and that extreme reaction of nervousness out of all proportion to the reason for the stop is understandable."

¶ 11                              II. ANALYSIS

¶ 12    Defendant argues that because the facts here are not in dispute, defendant's guilt is a question of law, which we review *de novo*, citing *People v. Smith*, 191 Ill. 2d 408, 411, 732 N.E.2d 513, 514 (2000). In *Smith*, however, the question was a legal one, whether defendant could be found guilty of armed violence, despite the undisputed fact that he dropped the gun out the window before police entered the apartment. In the present case, there is a question of fact, whether the facts testified to by Trooper Owen support an inference that defendant knew of the drugs in the hidden compartment. "Even if the facts are not disputed, if reasonable persons could draw different inferences from them, it is left to the trier of fact to resolve those questions." *People v. Brown*, 345 Ill. App. 3d 363, 366, 802 N.E.2d 356, 358 (2003). The usual standard of review in a criminal case is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114, 871 N.E.2d 728, 740 (2007). We conclude that standard applies here.

¶ 13                        A. Sufficiency of the Evidence

¶ 14    Defendant argues the State failed to prove beyond a reasonable doubt that he had either actual or constructive possession of the drugs. A criminal conviction can only be upheld if it is based on credible evidence which removes all reasonable doubt as to the defendant's guilt. *People v. Ortiz*, 196 Ill. 2d 236, 267, 752 N.E.2d 410, 429 (2001); see also *People v. Sanchez*, 375 Ill. App. 3d 299, 302-03, 873 N.E.2d 509, 512 (2007). If the controlled substance is found on the premises rather than on the defendant, the State can establish constructive possession if it can prove the defendant had knowledge and control over the premises by virtue of his connection to the premises. *People v. Ray*, 232 Ill. App. 3d 459, 462, 597 N.E.2d 756, 758 (1992). Constructive possession of contraband is often found where it is located on premises over which the defendant has control, such as the defendant's home. Defendant argues there is no proof that he had any control over a car that he did not own and where he was merely the passenger. "The State acknowledged Canizalez's lack of

control by virtue of the fact Owen never asked Canizalez for consent to search the car." Nor was there evidence that Canizalez in any way solicited, aided, abetted, or attempted to aid anyone in the possession or sale of methamphetamine. "There is nothing. The State's sole evidence on this point is that Canizalez was nervous, had two cell phones, and the car had air fresheners in it." There was no evidence of the contents of the phones, air fresheners without more prove nothing, and "[t]he source of Canizalez's nervousness is obvious: he was in the United States illegally, and being stopped by the police is a sure path to deportation." A verdict in a criminal case must be based on evidence and not upon guess, speculation, or conjecture. *People v. Games*, 94 Ill. App. 3d 130, 131, 418 N.E.2d 520, 521 (1981).

¶ 15    We disagree. "Constructive possession may be inferred from the facts, but evidence establishing constructive possession is often entirely circumstantial." *People v. Neylon*, 327 Ill. App. 3d 300, 306, 762 N.E.2d 1127, 1133 (2002). This is not a case like *People v. Adams*, 242 Ill. App. 3d 830, 832, 610 N.E.2d 763, 765 (1993), where defendant was a visitor to the apartment where cocaine was found under the bathroom sink. Defendant's connection to the Toyota was substantial; he had ridden in and driven the vehicle from Los Angeles to Illinois. Both defendant and Galaviz exhibited the same level of nervousness in their encounter with Trooper Owen, an experienced police officer who stated that defendant's nervousness was above and beyond that exhibited by an average driver. Nervousness is not in and of itself sufficient to uphold a finding of knowledge, but it "does weigh in favor of a finding of knowledge." *Ortiz*, 196 Ill. 2d at 266-67, 752 N.E.2d at 429. There were multiple air fresheners in the passenger section of the car that defendant obviously observed. As noted by the trial court, it is incredible to believe defendant's argument that for no reason he helped drive a car across the country for delivery to an unidentified Cuban. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

¶ 16                    B. Denial of the Motion To Suppress

¶ 17    Next defendant argues the circuit court erred in denying his motion to suppress, as the traffic stop was unconstitutionally prolonged. The trial court's findings of fact on a motion to suppress are given great deference and will not be reversed unless they are against the manifest weight of the evidence. However, as to the trial court's ultimate legal ruling of whether reasonable suspicion or probable cause exists and whether suppression is warranted, *de novo* review applies. *People v. Sorenson*, 196 Ill. 2d 425, 431, 752 N.E.2d 1078, 1083 (2001). Upon initiating a minor traffic stop, a police officer may briefly detain the driver to request his driver's license and determine its validity and, under certain circumstances, conduct a speedy warrant check. "Once a check of a driver's license and any warrant information is completed, 'if no further suspicion is aroused, the traffic stop must cease and the individual should no longer be detained.' " *People v. Ramsey*, 362 Ill. App. 3d 610, 615, 839 N.E.2d 1093, 1098 (2005) (quoting *People v. Ortiz*, 317 Ill. App. 3d 212, 220, 738 N.E.2d 1011, 1018 (2000)).

¶ 18    A videotape here corroborated Trooper Owen's testimony that the traffic stop lasted seven to eight minutes before the canine alerted to drugs in the car. The trial court's finding

that the average time for a traffic stop in which warning tickets were issued was around 10 to 12 minutes is a reasonable one. Defendant argues "this initially proper traffic stop quickly transformed into an unrelated criminal interdiction investigation which impermissibly prolonged the stop." Defendant cites *People v. Baldwin*, 388 Ill. App. 3d 1028, 1034-35, 904 N.E.2d 1193, 1199 (2009). In that case, however, the trial court found that the duration of the traffic stop was unreasonable where the officer, after he decided not to give the defendant a ticket, prolonged the stop approximately 9 1/2 minutes by questioning defendant and calling for a drug-sniffing dog. See *People v. Kats*, 2012 IL App (3d) 100683, ¶ 21, 967 N.E.2d 335. In the present case, the trial court found that Owen was gathering information for the warning tickets, and this did not prolong the stop, especially considering the language barrier increasing the difficulty of communication between the men. Owen did not have to call for a drug-sniffing dog. The dog was already there.

¶ 19        An officer may question a passenger during a traffic stop if the questions are based on a reasonable, articulable suspicion justifying the question. *People v. Reatherford*, 345 Ill. App. 3d 327, 336, 802 N.E.2d 340, 349 (2003). By the time Owen questioned defendant, he had developed the requisite reasonable suspicion based on the nervousness of both men, Galaviz's incredible story, the multitude of air fresheners, and the tip that a car matching this description would be transporting drugs. The use of a narcotics-detection dog on the exterior of a vehicle during a lawful traffic stop generally does not implicate legitimate privacy interests. *Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005). An interior sniff has been upheld where a canine jumped through an open hatchback and alerted on a duffle bag, where the police did not encourage the canine to jump into the car. *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989). The same is true here. Xocko had already alerted on the outside of the vehicle before jumping into the car. The trial court correctly found that at the instant of Xocko's alert outside, the police had the requisite probable cause to search the interior of the vehicle anyway.

¶ 20                                C. Factors Considered in Sentencing

¶ 21        Defendant's final argument is that the trial court erred in sentencing when it considered the large quantity of drugs involved, a factor inherent in the offense, when it considered that Cardena was in the United States illegally, and when it failed to consider the costs of incarceration. Defense counsel failed to preserve these issues for review, but the office of the State Appellate Defender urges us to review these matters as plain error. In a plain error analysis, the first step for a reviewing court is to determine whether any error at all occurred. *People v. Lewis*, 234 Ill. 2d 32, 43, 912 N.E.2d 1220, 1227 (2009). We conclude there was no error in this case.

¶ 22        The trial court stated that the offense of which defendant was convicted required a minimum of 900 grams of methamphetamine, but defendant possessed over 2,200 grams of the drug. The trial court further clarified that "certainly I won't sentence the defendant for what is inherent in the definition of the offense." It is well established that a factor inherent in the offense should not be considered as a factor in aggravation at sentencing. There is a strong presumption that the trial court based its sentencing determination on proper legal

reasoning, and a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court. *People v. Dowding*, 388 Ill. App. 3d 936, 942-43, 904 N.E.2d 1022, 1028 (2009). The fact that defendant delivered a quantity of drugs in excess of the minimum for that sentencing range is considered a factor which the circuit court may properly take into account when setting sentence. *People v. Alcala*, 248 Ill. App. 3d 411, 425-26, 618 N.E.2d 497, 507-08 (1993). The legislature has also spoken on this issue.

"[T]he sentencing court may consider the following as indicative of the type of offenses which the legislature deems most damaging to the peace and welfare of the citizens of Illinois and which warrants the most severe penalties:

＊＊＊

(2) offenses involving unusually large quantities of controlled substances, as measured by their wholesale value at the time of the offense[.]" 720 ILCS 570/411(2) (West 2010).

¶ 23 The trial court properly considered defendant's current and prior illegal entries into this country, which were reflected in the presentence report and the trial record. A defendant's unwillingness to learn from his mistakes or to respect laws enacted for the protection of the public's safety is a proper factor for the trial court to consider in sentencing. *People v. Rader*, 272 Ill. App. 3d 796, 807, 651 N.E.2d 258, 266 (1995). We reject the implication that noncitizens typically should get shorter sentences for deportable crimes because they will be removed from the United States upon their release. *People v. Hamilton*, 2011 IL App (2d) 100739, ¶ 10, 962 N.E.2d 1105.

¶ 24 Section 5-4-1(a)(3) of the Unified Code of Corrections (730 ILCS 5/5-4-1(a)(3) (West 2010 (added by Pub. Act 87-417, § 1, eff. Jan. 1, 1992)) requires that the trial court consider the financial cost of incarceration. However, it is a well-settled principle that a trial court is not required to specify on the record the reasons for a defendant's sentence. Thus, it is reasonable to presume, absent evidence to the contrary, that the trial court performed its obligations and considered the financial impact statement before sentencing defendant. *People v. Acevedo*, 275 Ill. App. 3d 420, 424-26, 656 N.E.2d 118, 122-23 (1995). In the present case, defendant concedes that the Department of Corrections' 2011 financial impact statement was issued in compliance with section 5-4-1. The trial court did not err in sentencing defendant.

¶ 25                                    III. CONCLUSION

¶ 26 For the foregoing reasons, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.

¶ 27 Affirmed.