**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180121-U

Order filed September 18, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0121 Circuit No. 16-CF-409 |
| JOSHUA L. HAYNES, | ) ) ) | Honorable Stephen Kouri and Thomas Keith, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

JUSTICE O'BRIEN delivered the judgment of the court.
Justice Carter concurred in the judgment.
Justice Schmidt dissented.

_____

**ORDER**

¶ 1    *Held*:  (1) The court erroneously admitted Detective Fitzgerald's opinion testimony, and this otherwise forfeited error is subject to reversal under the closely balanced prong of the plain error rule. (2) We take no position on defendant's claim that pretrial counsel provided ineffective assistance when he surrendered defendant's bond in case No. 14-CF-405 as the record is insufficient to address this claim.

¶ 2    Defendant, Joshua L. Haynes, appeals from his conviction for unlawful possession of a

methamphetamine precursor. Defendant raise two arguments in this appeal: (1) the Tazewell

County circuit court erroneously allowed Detective Justin Fitzgerald to testify that defendant's two

purchases of pseudoephedrine were consistent with an intent to produce methamphetamine, and (2) defense counsel provided ineffective assistance for surrendering defendant's bond in a related case which deprived defendant of his right to a speedy trial in the instant case. We reverse and remand.

¶ 3                                           I. BACKGROUND

¶ 4        In September 2014, the State charged defendant, in case No. 14-CF-405, with one count each of aggravated driving under the influence (DUI) (625 ILCS 5/11-501 (West 2014)), driving while license revoked (*id.* § 6-303(a)), and obstructing identification (720 ILCS 5/31-4.5(a) (West 2014)).[1] On September 24, 2014, defendant posted bond and was released from custody. On August 8, 2016, defendant pled guilty to counts II and III. Count I remained set for trial.

¶ 5        Also, on August 8, 2016, Officer Brett Butler placed defendant under arrest for unlawful possession of methamphetamine precursors (720 ILCS 646/20(a)(1) (West 2016)). The next day, in case No. 16-CF-409, the State filed an information that charged defendant with the same offense. The court appointed the public defender to represent defendant and set his bond at $100,000. On September 1, 2016, the court set the case for trial on October 17, 2016.

¶ 6        On September 12, 2016, in case No. 14-CF-405, assistant public defender Matthew Hoppock told the court "I spoke to [defendant] on Friday, along with [Public Defender] Taylor, and [defendant] is surrendering himself on his bond in the traffic case."

¶ 7        On October 11, 2016, the court granted the State's motion to continue the case over defendant's objection. The State also noted that it was electing to prosecute case No. 14-CF-405 before the present case.

_____

[1]Defendant filed a motion requesting that we take judicial notice of appellate court case No. 3-18-0647. We grant this motion as the record in case No. 3-18-0647 contains facts relevant to the issues raised in the instant case.

¶ 8        On November 4, 2016, the court entered an agreed order to continue the case to February 27, 2017.

¶ 9        On February 23, 2017, in case No. 14-CF-405, defendant pled guilty to count I aggravated DUI.

¶ 10       On February 27, 2017, in the instant case, defendant reasserted his demand for a speedy trial. The court continued the case.

¶ 11       On April 7, 2017, assistant public defender Joseph Bembenek appeared on behalf of defendant and noted that the case had been reassigned to him. Bembenek noted the case was set for a jury trial on April 24, 2017, and asked for a continuance. Defendant objected to counsel's request. The court set the case for review on April 24, and trial on May 22, 2017.

¶ 12       On April 24, 2017, the court granted the State's motion to continue the case over defendant's objection. The court set the case for trial on June 19, 2017.

¶ 13       On May 12, 2017, the State moved to continue the trial to July 17, 2017. Defendant objected stating that he had been incarcerated since August 8, 2016, and this was the "main charge" that was keeping him in custody. The court denied the State's motion.

¶ 14       On May 22, 2017, the State moved to continue the trial to June 26, 2017. The court granted the motion over defendant's objection.

¶ 15       On June 23, 2017, the parties agreed to continue the case to July 17, 2017, for a jury trial. Judge Stephen Kouri presided over the trial.

¶ 16       Donald Burgett testified that on April 29, 2016, defendant asked Burgett to purchase pseudoephedrine for him because he was suffering from allergies. Defendant told Burgett that he could not purchase the pseudoephedrine for himself. Defendant paid Burgett $10 to make the purchase. Later that day, Burgett purchased the pseudoephedrine from a Walgreens pharmacy.

3

Burgett then gave the pseudoephedrine to defendant. Burgett did not know what defendant did with the pills.

¶ 17　　Detective Fitzgerald testified that he was a member of the Tazewell County Methamphetamine Task Force. Fitzgerald had worked "[s]everal hundred" cases involving methamphetamine since 2009. Fitzgerald also had taken numerous courses related to methamphetamine. The State tendered Fitzgerald as an expert in methamphetamine production. Defense counsel elected to conduct his *voir dire* during cross-examination.

¶ 18　　Fitzgerald testified that pseudoephedrine was the main ingredient used to manufacture methamphetamine, and it was known as a precursor. As a member of the Methamphetamine Task Force, Fitzgerald reviewed pseudoephedrine purchases using the national precursor log exchange (NPLEX) records. The NPLEX indexed pseudoephedrine sales by pharmacy. It contained the names of every person who purchased pseudoephedrine at the listed pharmacies. Fitzgerald looked for suspicious pseudoephedrine purchases by examining the: brand of pseudoephedrine purchased, pseudoephedrine content, and buyer's purchase history. By comparing the buyer purchases histories, Fitzgerald could determine if several individuals were purchasing similar products at the same pharmacy at the same time.

¶ 19　　While investigating an unrelated April 29, 2016, pseudoephedrine purchase, Fitzgerald noticed that defendant had also purchased pseudoephedrine on the same date from the same Walgreens pharmacy. Defendant purchased more pseudoephedrine on July 6, 2016. On both occasions, defendant purchased medication that contained 2.88 grams of pseudoephedrine. The State then asked, "And in the course of that investigation, did you find [defendant's] purchases consistent or inconsistent with procurement or possession for methamphetamine production?" Defense counsel objected to the question, and after an off-the-record discussion, the court

4

overruled counsel's objection. The State rephrased its question, and Fitzgerald testified that he found defendant's two purchases to be consistent with methamphetamine production.

¶ 20    On cross-examination, Fitzgerald testified that pseudoephedrine was available for purchase without a prescription. However, a single buyer could purchase no more than 7500 milligrams of pseudoephedrine in a 30-day period. Both of defendant's purchases were below this purchase limit. Fitzgerald said that defendant's July 6, 2016, purchase was generally lawful. Fitzgerald did not know what defendant did with the pseudoephedrine that he purchased on April 29, or July 6, 2016. Fitzgerald also did not know if defendant suffered from allergy-related symptoms that pseudoephedrine could be lawfully used to treat.

¶ 21    On cross-examination of Fitzgerald, defense counsel asked: "Without waiving my objection, Your Honor, you told us, Detective, that [defendant's] purchases of the pseudoephedrine was consistent with that being used in manufacturing methamphetamine as explained in your course of conduct, correct?" Fitzgerald responded in the affirmative.

¶ 22    On redirect examination, Fitzgerald testified that on April 29, 2016, both Burgett and defendant purchased the same generic brand of pseudoephedrine. Fitzgerald explained that defendant could not buy a second package of pseudoephedrine within 24 hours of his first purchase. The State then asked "based on your training and your experience, is there anything that stands out about these two purchases on April 29 by two different individuals, one of whom was given money from the [d]efendant to purchase this pseudoephedrine?" Defense counsel objected to the question, and the court sustained the objection. The State then asked, "Are you aware, based on your training and experience, of situations in which one individual pays another one to purchases boxes of pseudoephedrine?" Defense counsel objected, and the court overruled the objection. Fitzgerald said he was aware of such situations.

5

¶ 23    During a break in Fitzgerald's testimony, defense counsel argued Fitzgerald's testimony that defendant's purchases were consistent with methamphetamine production was inadmissible opinion testimony. Counsel argued the State had not disclosed Fitzgerald as an expert or provided a summary of his testimony before trial. Counsel also argued that Fitzgerald's testimony could not be construed as a lay opinion. Counsel asked the court to strike the testimony.

¶ 24    The court initially stated:

> "[L]et me mention something about the expert testimony, because I want to just clarify for the record. I do think expert opinions, as a general rule, need to be disclosed ahead of time. I'm not sure that it has to be by a written report, but in any event, there should be disclosure."

The court found that the State elicited Fitzgerald's opinion testimony to show his course of investigation. The court did not bar the testimony but stated it would give a limiting instruction to the jury. The court later instructed the jury:

> "Don't concern yourself with the basis and the reasons for that objection, but I want to instruct the jury that I allowed that testimony in, what his opinion was, as to his review, or after his review of those purchases, the various purchases, I allowed that opinion evidence in not for evidence of whether or not this [d]efendant committed the offense that he's charged with.
>
> I let it in so that there was context into what step he took next in his investigation, and you are only to consider that testimony, that opinion testimony, in response to that question. You're only to consider that in the context of what that officer did next in his investigation, why he went to the next step.

6

It's not any evidence. It's not to be considered by you as evidence that this [d]efendant committed the offense that he's being charged with, so I hope that makes some sense to you."

¶ 25    Fitzgerald also provided the foundation for the recording of a telephone call that defendant placed to his mother from the Tazewell County jail. During the recording, defendant suggested that his mother could sell his Link card. Defendant also suggested that his mother needed "to hustle" like he did to make money. Defendant's mother also said that an individual named "Michael" asked her if defendant "had anything for sale." Defendant's mother also indicated that she had searched the garage for an unspecified item. She noted that no one was willing to help her with this search, and that "Michael" had told her to look for powder and pills. Defendant later explained that he thought someone had planted methamphetamine manufacturing material in the garage. Defendant told his mother to speak with "Michael" again to help her find the item in the garage. Defendant said that he could be in bigger trouble if his mother did not find the item, and a man named Derek Block was trying to set him up. Toward the end of the call, defendant said that he "really don't know what it is." Defendant then told his mother that he wanted her to sell a stereo and refrigerator.

¶ 26    During Fitzgerald's testimony, the State admitted a video-recorded interview that Fitzgerald conducted with defendant. The video established that on August 10, 2016, defendant approached the police to provide information in exchange for assistance with his pending case. Defendant told Fitzgerald that he heard that certain individuals were producing methamphetamine. Defendant had heard that an individual was making methamphetamine at his cousin's house. Defendant knew other people who made methamphetamine, but he did not want to disclose their names because some were related to him, and he wanted assurance that he would receive assistance

7

with his pending case. Defendant was not involved in his relative's methamphetamine manufacturing.

¶ 27 During the interview, defendant acknowledged that he had issues with addiction, and he had consumed pseudoephedrine pills to cope with this addiction. Defendant explained that he had been sober for approximately one year when he met Block. Defendant and Block started drinking alcohol together, and Block convinced defendant to purchase boxes of pseudoephedrine. Defendant said that he had an addiction, but he was "not a cook." Defendant also admitted that he asked an individual he knew as "Donald" (Burgett) to buy a box of pseudoephedrine for his personal use. Defendant also said that if he could not find someone "that wanted" the pseudoephedrine pills, he would crush the pills and use them for himself or to treat a cold. Defendant noted that sometimes you "could get a high off just snorting them."

¶ 28 Krista McCormick testified that she worked for Appriss, Inc., the company that managed the NPLEX records. As the records keeper for NPLEX, McCormick had provided to the State information from five different dates regarding two different individuals' pseudoephedrine purchases. The purchase logs documented that defendant purchased pseudoephedrine at a Walgreens pharmacy on April 29, 2016, at 11:39 a.m., and on July 6, 2016, at 12:36 p.m.

¶ 29 The State argued in its closing that methamphetamine production was within Fitzgerald's range of expertise. The State also argued that Fitzgerald's testimony established that defendant's pseudoephedrine purchase was consistent with methamphetamine production. Defense counsel objected to this argument contending that the State's argument violated the court's instruction that Fitzgerald's statement was submitted for a limited purpose. The court overruled counsel's objection noting that it will provide a limiting instruction that specifies "certain evidence that was admitted only for a limited purpose." The court later instructed the jury that "[a]ny evidence that

was received for a limited purpose should not be considered by you for any other purpose." The jury found defendant guilty.

¶ 30    The court appointed new counsel to represent defendant during the posttrial proceedings. Posttrial counsel filed an amended motion for a new trial.

¶ 31    During the posttrial proceedings, defendant claimed trial counsel had provided ineffective assistance when he failed to assert a violation of defendant's statutory right to a speedy trial. The court found defendant's claim did not warrant the appointment of new counsel.

¶ 32    Judge Thomas Keith heard posttrial counsel's amended motion for a new trial. Judge Keith denied the motion and sentenced defendant to nine years' imprisonment. Defendant appeals.

¶ 33                                              II. ANALYSIS

¶ 34                                        A. Fitzgerald's Testimony

¶ 35    Defendant argues the court erroneously allowed Fitzgerald to opine that defendant's pseudoephedrine purchases were consistent with methamphetamine production. Defendant acknowledges that he forfeited this issue when he did not include it in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, he argues that the error is reversible plain error because the evidence was closely balanced.

¶ 36    Illinois Supreme Court Rule 615(a), commonly known as the plain error rule permits a reviewing court to excuse a defendant's procedural default. *People v. Sebby*, 2017 IL 119445, ¶ 48. The supreme court has identified two instances when a court may excuse a defendant's forfeiture under the rule: (1) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial

9

process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (quoting *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). The first step under either prong of the plain error rule is to determine whether there is a clear or obvious error. *Id.*

¶ 37                                  1. Error

¶ 38        Defendant argues Fitzgerald's opinion testimony that defendant's purchases of pseudoephedrine were consistent with methamphetamine production was erroneously admitted at trial because: (1) the statement did not explain the course of Fitzgerald's investigation—the rationale proffered by the circuit court, (2) it could not be admitted as a lay opinion, and (3) it could not be admitted as an expert opinion. While the court did not cite the latter two reasons, we review the court's ruling without regard to the validity of its rationale. *People v. Reed*, 361 Ill. App. 3d 995, 1000 (2005). We address each of defendant's arguments of error in turn.

¶ 39        First, defendant argues the court erred in admitting Fitzgerald's opinion testimony as evidence of the course of the investigation. Generally, a police officer "may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact." *People v. Simms*, 143 Ill. 2d 154, 174 (1991). An officer's statement that explains his course of investigation should not be admitted if it reveals unnecessary and prejudicial information. *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 40. The State may not use the investigatory procedure exception "to place into evidence the *substance* of any out-of-court statement that the officer hears during his investigation, but may only elicit such evidence to establish the police investigative process." (Emphasis in original.) *Id.* ¶ 41.

¶ 40        The record establishes that Fitzgerald's testimony that he found defendant's pseudoephedrine purchases to be consistent with methamphetamine production did not explain his

10

course of investigation. The only police conduct that occurred after Fitzgerald's review of defendant's pseudoephedrine purchases was to place defendant under arrest. Fitzgerald did not arrange an interview with defendant due to his purchases—defendant voluntarily arranged a meeting with the police—and he did not apply for a warrant to search defendant's person or home. Therefore, the course of the investigation exception does not support the introduction of Fitzgerald's opinion.

¶ 41 Second, defendant argues Fitzgerald's testimony was inadmissible as a lay opinion. Illinois Rule of Evidence 701 provides:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 42 Fitzgerald's opinion was not rationally based on his perception. Fitzgerald did not observe either of defendant's pseudoephedrine purchases. Additionally, defendant did not meet with Fitzgerald until August 10, 2016, more than one month after his last purchase. Therefore, Fitzgerald's opinion as to whether defendant's procurement of pseudoephedrine was consistent with methamphetamine production could not be admitted as a lay opinion.

¶ 43 Third, defendant argues Fitzgerald's testimony could not be admitted as an expert opinion because (1) the State did not disclose Fitzgerald as an expert witness and provide a report of his proposed opinions before trial, and (2) the court did not make a finding that Fitzgerald was qualified as an expert in the field methamphetamine production. Illinois Rule of Evidence 702

11

permits the introduction of expert opinion testimony "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue ***." Ill. R. Evid. 702 (eff. Jan. 1, 2011). If the State elects to use expert testimony at trial, and defense counsel files a written motion to disclose the State's evidence, then the State must disclose "any reports or statements of experts, made in connection with the particular case, *** and a statement of qualifications of the expert." Ill. S. Ct. R. 412(a)(iv) (eff. Mar. 1, 2001). In determining whether to admit expert testimony at trial, the court should "balance the probative value of the evidence against its prejudicial effect to determine the reliability of the testimony." *People v. Lerma*, 2016 IL 118496, ¶ 23; see also Ill. R. Evid. 403 (eff. Jan. 1, 2011) (relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice"). The decision of whether to admit expert testimony rests with the sound discretion of the circuit court. *People v. Reatherford*, 345 Ill. App. 3d 327, 341 (2003).

¶ 44    The record establishes that the State did not disclose any reports or statements detailing Fitzgerald's expert opinion nor his qualifications as an expert before trial. Additionally, the court's comments that it thought "expert opinions, as a general rule, need to be disclosed ahead of time" tends to confirm the State's failure to disclose Fitzgerald's expert opinion prior to his testimony. As noted by the supreme court in *People v. Lovejoy*, 235 Ill. 2d 97, 118 (2009), "[d]iscovery rules are intended to protect the accused against surprise, unfairness, and inadequate preparation." Therefore, without this disclosure, defense counsel could not adequately prepare his challenge to Fitzgerald's qualifications and opinion. See Ill. S. Ct. R. 412(a)(iv), Committee Comments (rev. Mar. 1, 2001). As we find the State's failure to properly disclose Fitzgerald as an expert witness before trial is a plain error, we need not address defendant's second argument that the court did not find that Fitzgerald was qualified to testify as an expert.

12

¶ 45          For purposes of our plain error analysis, the State's failure to disclose Fitzgerald's expert testimony constituted a clear or obvious error. Having found error in the admission of Fitzgerald's opinion, we need not address defendant's second contention—the court did not find that Fitzgerald was qualified to testify as an expert in the field of methamphetamine production. Ultimately, due to the State's disclosure error, Fitzgerald's opinion should not have been admitted into evidence as an expert opinion.

¶ 46                                  2. Closely Balanced

¶ 47          Having found that the admission of Fitzgerald's opinion testimony was a plain error, we must next determine whether that error is subject to reversal. Defendant argues, under the first prong, that this plain error is reversible because the evidence was so closely balanced that the error alone tipped the scales of justice against him.

¶ 48          Under the first prong of the plain error rule, defendant has the burden to show "the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. Under this prong, prejudice is not presumed. *Id.* An error is prejudicial not because it is serious, but because "it occurred in a close case where its impact on the result was potentially dispositive." *Id.* ¶ 68. To determine whether the evidence was close, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. This analysis involves an assessment of the evidence on the elements of the charged offense and any evidence regarding the witnesses' credibility. *Id.*

¶ 49          The State charged defendant with unlawful possession of a methamphetamine precursor. 720 ILCS 646/20(a)(1) (West 2016). This charge required the State to prove that defendant:

> "[K]nowingly possess[ed], procure[d], transport[ed], store[d], or deliver[ed] any methamphetamine precursor or substance containing any methamphetamine

13

precursor in standard dosage form with the intent that it be used to manufacture methamphetamine or a substance containing methamphetamine." *Id.*

¶ 50 We find the evidence in this case to be closely balanced. In particular, the evidence of defendant's "intent that [the pseudoephedrine] *be used to manufacture methamphetamine*" was almost entirely based on Fitzgerald's opinion testimony. (Emphasis added.) *Id.* The direct evidence established that defendant purchased 2.88 grams of pseudoephedrine, a methamphetamine precursor, from Walgreens on April 29, 2016, and an additional 2.88 grams on July 6, 2016. Both of these purchases were well below the 7500 milligram purchase limit and occurred more than 30 days apart. See 720 ILCS 648/20(b) (West 2016). Facially, these purchases were lawfully made. This evidence conclusively showed that defendant knowingly *possessed* a methamphetamine precursor. It does not show that defendant intended that that precursor be used to manufacture methamphetamine. This is especially true when viewed in conjunction with defendant's unrebutted assertion that he took pseudoephedrine to treat his allergies and he told Burgett that he needed the medication for his allergies—a lawful use of the medication.

¶ 51 Burgett's testimony that he purchased pseudoephedrine on April 29, 2016, at defendant's direction, similarly fails to show an intent to manufacture methamphetamine. Burgett purchased a lawful amount of pseudoephedrine—2.88 grams. See *id.* However, because Burgett made the purchase at defendant's behest and defendant received the package from Burgett, he arguably violated subsection 20(f) of the Methamphetamine Precursor Control Act. *Id.* § 20(f). This potential violation does not, however, inferentially establish that defendant, by acquiring the pseudoephedrine by an unlawful means, intended that it be used to manufacture methamphetamine. The only inference from Burgett's testimony that finds support in the record is that defendant directed Burgett to purchase the pseudoephedrine to feed his addiction to the

14

precursor itself. *Supra* ¶ 27. While Burgett's testimony is potentially indicative of other uncharged offenses, it fails to establish an intent to manufacture methamphetamine.

¶ 52   The remaining evidence similarly fails to establish an intent to manufacture methamphetamine. During the police interview, defendant told Fitzgerald that he knew individuals who manufactured methamphetamine. Viewed in context, defendant made this statement in an attempt to secure a plea agreement in his pending case. Moreover, simply knowing individuals that manufacture methamphetamine does not establish that defendant intended to seek these individuals' assistance in April or July 2016 to convert the pseudoephedrine that he and Burgett purchased into methamphetamine. Additionally, defendant told the officer that he consumed the pseudoephedrine in its unaltered state to treat cold symptoms and cope with his addiction. In furtherance of this explanation, defendant noted that he could obtain a high from the pseudoephedrine by crushing and snorting it. At best, this evidence indicated that defendant may have used methamphetamine in the past and had consumed pseudoephedrine to get high. It did not show that defendant intended, in April and July 2016, to manufacture methamphetamine from the pseudoephedrine that he and Burgett purchased. To the contrary, defendant expressly told the police that he was "not a cook." Nothing in the video expressly rebutted defendant's claim.

¶ 53   Defendant's telephone call to his mother about the purported methamphetamine or methamphetamine precursor in the garage also did not establish an intent to manufacture methamphetamine. Instead, this evidence suggested that defendant might possess methamphetamine—an offense that was not charged in this case. Moreover, there was no indication on the recording that the garage contained other materials indicative of methamphetamine manufacturing. See, *e.g.*, *People v. Wilke*, 367 Ill. App. 3d 130, 132 (2006) (noting that while an individual could legally possess pseudoephedrine, brillo pads, a cooler, a

15

strainer, a clear plastic jug, some gas tanks, another gas tank with PVC piping, boxes of Miracle Grow plant food, white jugs with spray tops, bottles of Heet, and a lithium battery, they are ingredients in methamphetamine production). The only indication from the call was that there might be powder or pills located in the garage. While powders and pills could be part of the methamphetamine production process they also could be attributed to other criminal and lawful acts. This statement was too generic to establish the specific intent required for the charged offense.

¶ 54 Defendant also directed his mother to sell some items to raise money. Notably, defendant did not directly reference selling methamphetamine or precursors, but instead suggested that his mother sell his Link card, a stereo, and a refrigerator. These statements did not indicate an intent to manufacture methamphetamine. Even if defendant's statement to his mother that she needed to learn how to "hustle" is construed as a suggestion that she sell methamphetamine or precursors, this only establishes an intent to deliver methamphetamine, not produce it.

¶ 55 The clearest evidence of defendant's intent came from Fitzgerald's opinion testimony. As an expert witness, Fitzgerald could rely on his training and experience to link together the inferences from the other evidence and opine that this evidence showed defendant's intent to manufacture methamphetamine. However, because the court committed plain error in admitting this testimony, and the remaining evidence of defendant's intent was close, and the "impact [of this error] on the result was potentially dispositive." *Sebby*, 2017 IL 119445, ¶ 68. Accordingly, we reverse defendant's conviction and remand for a new trial.[2]

¶ 56 B. Speedy Trial Right

---

[2]Due to our plain error ruling, we need not address defendant's alternative argument that the error was the result of ineffective assistance of counsel.

¶ 57    Defendant argues trial counsel provided ineffective assistance when he surrendered defendant's bond in case No. 14-CF-405. As a result of the surrender, defendant was in simultaneous custody and subject to the 160-day statutory speedy trial timeline instead of the otherwise applicable 120-day timeline. We find that the record is insufficient to discern whether counsel's decision to surrender defendant's bond in case No. 14-CF-405 was strategic, and therefore, we take no position on this issue.

¶ 58    A criminal defendant has a constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. As we noted with regard to the first issue, to prevail on a claim of ineffective assistance of counsel, defendant must show that: (1) counsel's performance was deficient, and (2) but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Generally, a defendant must raise his claim of ineffective assistance of counsel in his direct appeal or risk forfeiting the claim. *People v. Veach*, 2017 IL 120649, ¶ 47. Additionally, issues that could have been raised on direct appeal are deemed procedurally defaulted. *Id.* Despite the well-established preference that ineffective assistance of counsel claims be brought on direct appeal, some of these claims may occasionally be better suited to collateral proceedings when "the record is incomplete or inadequate for resolving the claim." *Id.* ¶ 46.

¶ 59    After reviewing the records in both case No. 14-CF-405 and the present case, we find defendant's ineffective assistance claim to be better suited for a collateral proceeding. In this direct appeal, defendant contends that counsel's action to surrender his bond in case No. 14-CF-405 adversely impacted him in the present case. Looking narrowly at the record in the instant case, the harm caused by the bond surrender is plainly apparent—it set the speedy trial clock in the instant case to 160 days, instead of 120 days. See 725 ILCS 5/103-5(e) (West 2016) ("If a person is

17

simultaneously in custody upon more than one charge pending against him in the same county \*\*\*. Such person shall be tried upon all of the remaining charges thus pending within 160 days from the date on which judgment relative to the first charge thus prosecuted is rendered \*\*\*."). However, the record of the hearing when counsel surrendered defendant's bond in case No. 14-CF-405 makes clear that the record does not fully explain rationale for the surrender. At the hearing, Hoppock said "I spoke to [defendant] on Friday, along with [Public Defender] Taylor, and [defendant] is surrendering himself on his bond in the traffic cases." Counsel's reference to his prior conversations indicates that some consideration went into the decision to surrender the bond. As this is counsel's only reference to the bond surrender, we are unable to discern if there was a strategic reason that is unique to case No. 14-CF-405 that motivated counsel to surrender the bond. Therefore, we find that this ineffective assistance of counsel issue is better suited for a collateral proceeding where defendant can supplement the record with evidence of his conversation with counsel as to the reasons or lack thereof for the bond surrender. Accordingly, we take no position on the merits of this issue.

¶ 60                    C. Motion to Strike Transcript of Telephone Conversation

¶ 61        Defendant filed a motion to strike the transcript of defendant's telephone call from the Tazewell County jail to his mother. We grant defendant's motion as the State did not move to supplement the record with this transcript, and it is not part of the trial record. Moreover, we did not consider the transcript in reaching our decision, and instead, relied on the telephone recording admitted at trial and played for the jury.

¶ 62                                  III. CONCLUSION

¶ 63        The judgment of the circuit court of Tazewell County is reversed and remanded.

¶ 64        Reversed and remanded.

¶ 65          JUSTICE SCHMIDT, dissenting:

¶ 66          The evidence was not closely balanced. Therefore, we should honor defendant's forfeiture of any error regarding expert testimony. The majority attacks each piece of evidence indicating that defendant intended the pseudoephedrine be used to manufacture methamphetamine. While I agree that no one piece of evidence alone establishes defendant's criminal intent, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. The majority discusses this evidence. *Supra* ¶¶ 50-54. Taken as a whole, the evidence is not closely balanced.

¶ 67          I would affirm.